741 N.W.2d 173 (2007)
16 Neb. App. 170
Kristi A. SHAFER, Appellee,
v.
Layne D. SHAFER, Appellant.
No. A-06-362.
Court of Appeals of Nebraska.
November 13, 2007.
*174 Claude E. Berreckman, Jr., of Berreckman & Berreckman, P.C., Cozad, for appellant.
Kent A. Schroeder, of Ross, Schroeder & George, L.L.C., Kearney, for appellee.
IRWIN, SIEVERS, and CASSEL, Judges.
SIEVERS, Judge.
Kristi A. Shafer and Layne D. Shafer were married on April 26, 1991, and Kristi filed a complaint for dissolution of marriage on August 4, 2004. Although a decree of dissolution was entered on June 7, 2005, motions for new trial were sustained in part with the ultimate result that Layne filed his appeal on March 29, 2006  which was timely. The divorce trial involved a number of somewhat complex issues, including Layne's premarital property, Kristi's inherited property, and the earning capacity of the parties for purposes of determining child support. However, Layne assigns only three errors in his appeal. After our review of the transcript, the testimony, the exhibits, and the parties' briefs, we have determined that the case is appropriate for disposition without oral argument pursuant to our authority under Neb. Ct. R. of Prac. 11B(1) (rev. 2006), and we have entered the appropriate order.

*175 PROCEDURAL AND FACTUAL BACKGROUND
Other than the brief procedural history set forth above, the procedural background of this case is unimportant to the resolution of the issues presented on appeal. The necessary factual background from the testimony and exhibits as well as the pertinent portions of the trial judge's decision will be set forth in our discussion of each of the three assignments of error.

ASSIGNMENTS OF ERROR
Layne assigns as error and argues that (1) the trial court erred in determining the amount excluded from the marital estate attributable to a trust distribution received by Kristi; (2) the trial court erred in failing to exclude from the marital estate livestock that was brought into the marriage by Layne; and (3) the trial court erred in awarding Kristi alimony.

STANDARD OF REVIEW
The division of property is entrusted to the discretion of the trial court and on appeal will be reviewed de novo on the record and affirmed in the absence of an abuse of the trial court's discretion. Ritz v. Ritz, 229 Neb. 859, 429 N.W.2d 707 (1988). In reviewing an award of alimony, an appellate court does not determine whether it would have awarded the same alimony, but whether the trial court's award is untenable so as to deprive a party of a substantial right or just relief. Kelly v. Kelly, 246 Neb. 55, 516 N.W.2d 612 (1994).

ANALYSIS

Trial Court's Treatment of Real Estate Acquired in Part by Distribution of Trust Was Correct.
The evidence shows that in December 1979, Evelyn Swanson (Kristi's mother) established an irrevocable trust known as the Evelyn R. Swanson Trust and named her children as beneficiaries, including Kristi and her sister, Brooke Swanson. The trust, by its terms, was to terminate when Brooke reached her 21st birthday, which occurred on January 15, 1995. Thereafter, all of the beneficiaries of the trust, including Kristi and Brooke, entered into an agreement in April 1995, providing for the distribution of the assets of the trust. The only distribution under the agreement with which we are concerned is provided for in paragraph 7, and it states:
It is further agreed that KRISTI SHAFER and BROOKE SWANSON shall receive as full payment of their distribution the following described real estate, to-wit: "Southwest Quarter (SW ¼) of Section 6, Township 10 North, Range 19 West of the 6th P.M., Dawson County, Nebraska[,]" valued at $150,000.00, and that they will assume a remaining indebtedness to Eileen Lahm, contract seller of said real estate, in the amount of $45,000. It is further understood that the debt against the pivot irrigation system located on said real estate shall be paid in full prior to said distribution [we presume from trust assets]. It is further agreed that KRISTI SHAFER and BROOKE SWANSON shall further receive the sum of $32,000.00 in cash, or the same may be used to reduce the indebtedness to Lahm, which would reduce the indebtedness to $14,000.00.
Kristi testified that she received $68,000 from the trust which was used to pay for the southwest quarter of Section 6, but that Layne handled the details of the land transfer. The evidence clearly shows that Kristi's distribution from the trust did not fully cover the acquisition costs of the *176 quarter section at issue. The record contains a joint tenancy deed whereby Brooke conveyed all of her undivided interest in the quarter section to Layne and Kristi as joint tenants.
Layne testified that there was an agreement that the five siblings would receive $68,000 and that Kristi's brothers "and us, we took it out in real estate, but in our process, we paid her sister off, and we assumed the loan that the Swanson Trust had started with Eileen Lahm.... So we just paid Brooke and Eileen Lahm off for six or seven years." Layne testified that Brooke was paid $10,000 down with the balance paid in annual payments over the ensuing years, but that such debt was fully paid, as was the debt to Eileen Lahm, by the time of the parties' separation.
Kristi's testimony was that she should receive a set-aside in the amount of $118,093 from the marital estate for her inheritance from her mother's trust. This amount represented the value of her original inheritance plus the proportional share of the increase in value of the quarter section from $150,000 in 1995 to $260,500 in 2005. The trial court reconciled and summarized the net result of the transactions involving the quarter section in its decree, which we summarize as follows:

 Value of land received $150,000
 Money received 32,000
 Debt assumed (Lahm) (46,000)
 Evelyn R. Swanson Trust (net received) 136,000
 Kristi's one-half shar 68,000

The trial court then reasoned as follows:
Thus, Kristi's inherited share was equal to 45.33% of the value of the land purchased by Kristi and Layne ($68,000.00 divided by $150,000.00). There is no evidence of any substantial improvements to the land after its acquisition and it further appears that the appreciation in value of the land from the 1992 value of $150,000.00 to the present value of $260,500.00 is due to market forces and circumstances separate from any improvements made to the property by the parties. Upon consideration of the evidence, the court finds that Kristi has established that 45.33% of the current value of the 160 acres ... is attributed to her inheritance and that such value should be set aside as her sole and separate property and the same is excluded from the marital estate.
Accordingly, $118,085 was set off to Kristi. Her net marital estate award was $197,725. The net marital estate awarded to Layne was $248,738, and the court ordered Layne to pay Kristi the sum of $25,506 as property division equalization payable over time without interest if such payments were current.
Layne's attack on the district court's decision to exclude $118,085 of value of the quarter section, referred to by the parties as the "Lavery Quarter," is initially premised on the ground that the parties owned the property jointly. In rejecting this contention, we rely upon Schuman v. Schuman, 265 Neb. 459, 658 N.W.2d 30 (2003), where the court reiterated the familiar rule that the burden of proof to show that property is a nonmarital asset remains with the person making the claim. The Supreme Court in Schuman expressly disapproved the language in our opinion in Gerard-Ley v. Ley, 5 Neb.App. 229, 558 N.W.2d 63 (1996), where we said: "[W]hen a husband and wife take title to a property as joint tenants, even though one pays all the consideration therefor, a gift is presumed to be made by the spouse furnishing the consideration to the other ....'" The Supreme Court in Schuman said;hat to the extent that our holding in Gerard-Ley could be interpreted to mean that nonmarital property which during a marriage is titled in joint tenancy cannot be considered as a nonmarital asset during a divorce, such interpretation of our holding was disapproved. *177 The Schuman court then held that how inherited property will be considered in determining the division of property must depend upon the facts of the particular case and the equities involved and that if an inheritance can be identified, it is to be set off to the inheriting spouse and eliminated from the marital estate.
While Layne's brief acknowledges the opinion in Schuman, it nonetheless harkens back to the disapproved presumption from Gerard-Ley as a basis for us to find an abuse of discretion. We think it clear that Schuman did away with any presumption that may have arisen from Gerard-Ley. Layne asserts that the circumstances surrounding the acquisition of the property and the fact that they owned it as joint tenants should limit the nonmarital portion of the property to the $68,000 distribution from the trust. Layne also argues that there is no authority to support the trial court's exclusion of the appreciation in value of the Lavery Quarter from the marital estate. The trial court did not exclude all of the appreciation in the Lavery Quarter from the marital estate, but, rather, found that 45.33 percent of the acquisition cost of the Lavery Quarter was traceable to Kristi's inheritance and thus that she was entitled to have the same percentage of the Lavery Quarter's present value set aside to her and treated as nonmarital property. The trial court has merely performed a simple "tracing," and both its logic and math are unassailable and not an abuse of its discretion, being fully in accord with controlling precedent.
Layne references Van Newkirk v. Van Newkirk, 212 Neb. 730, 325 N.W.2d 832 (1982), which is typically cited for the rule that property acquired by one of the parties through gift or inheritance is ordinarily set off to such individual and not considered part of the marital estate unless the party not receiving the inheritance or gift has substantially cared for the property during the marriage. Layne argues that he continuously and exclusively cared for and farmed the property for the entire time that it was owned during the parties' marriage, but no evidence was introduced that the appreciation in the value of the property was the result of any substantial improvement or his farming and care of the Lavery Quarter during the parties' marriage. In the final analysis, the Van Newkirk court found that where appreciation in value of a farm inherited by the wife during the marriage was due principally to inflation and not to significant efforts by the husband, the farm should have been set aside to the wife and disregarded in computing the marital estate. Here, the trial court made a specific factual finding that "[t]here is no evidence of substantial improvements to the land after its acquisition" and that its appreciation was due to market forces. Layne does not cite us to any evidence in the record which would belie the trial court's conclusion in this regard. Accordingly, we find that this assignment of error is without merit and that the trial court did not err in setting aside 45.33 percent of the value at the time of trial of the Lavery Quarter to Kristi as nonmarital property. Layne's first assignment of error is without merit.

Should Trial Court Have Excluded Some of Parties' Cattle as Premarital Property?
Layne asserts that his financial statement given to his banker in May 1991 demonstrates that from that time to the time of trial, the number of animals has increased to 166, a 43 percent increase over the number of cattle Layne brought into the marriage. We have already articulated the basic standards *178 about premarital property and tracing. As Layne concedes, livestock are "perishable" with limited useful life, and thus, Layne argues that the court should have applied an equitable standard with respect to his burden to prove that the livestock owned at the time of the marriage are traceable to the livestock owned at the time of trial. Layne's testimony on the issue of the livestock is quite brief, and we quote:
Q What have you done throughout your marriage with your livestock? Have you replaced livestock as you've sold it?
A I would have had to. If I only had 48 cows then [at the time of the marriage] and I didn't replace them, I wouldn't have 73 today.
Q Has there ever been a period of time during your marriage when you stopped farming or you stopped your livestock operation?
A No.
Q Has it been continuous throughout the course of your marriage?
A Sure.
Q And has the number of livestock remained static or gradually increased?
A Gradually increased until the year 2000, 2001. We had 120, 125 cows, and the drought and everything, we sold back because we didn't have the grass and things to take care of [them].
Kristi's testimony sheds additional light on the subject, and again we quote:
Q None of those [referencing cattle], unless they became sick and died, would have been junked or 
A No.
Q And they generally wouldn't have been traded either, would they?
A Sold.
Q And when they were sold, was it normally your husband's practice, do you know, to replace them 
A Yes.
Q  with proceeds from the sale?
A Yes.
Q And at the time of your separation as the property statement would indicate, the number of livestock and the value of livestock in the farm operation actually exceed what exists at the time of the marriage, don't they?
A Correct. By a lot, I'm pretty sure.
Exhibit 7, Layne's financial statement of May 20, 1991, a month after the marriage, shows the following with respect to livestock, and he testified that he owned such immediately before the marriage:

48 cows average weight 1,000 pounds at
 $700 per head $ 33,600
10 heifers 1 year old, average weight 850
 pounds at $700 per head 7,000
45 calves at $200 per head 9,000
 3 bulls average weight 1,500 pounds at
 $1,000 per head 3,000
10 steers 1 year old, average weight 800
 pounds at $700 per head 7,000
 _______
 $ 59,600

In contrast, exhibit 1, the joint property statement of the parties, shows that as of March 2005, the parties possessed the following cattle:

73 cows bred and open $ 58,400
90 calves 56,250
 3 bulls 3,000
 ________
 $117,650

Thus, by comparison of these two exhibits, we see that the value of the parties' cattle herd has increased by the sum of $58,050 during the term of the marriage.
The only Nebraska divorce case involving a set-aside for premarital cattle we have found is an unpublished opinion of this court in which the setoff was allowed. And while such case is not binding precedent, it reminds us that a divorce action sounds in equity. See Kouth v. Kouth, 238 Neb. 230, 469 N.W.2d 791 (1991). Obviously, one cannot draw a straight line from *179 a cow owned by Layne to a cow owned 13 years later by Layne and Kristi, which is the prototypical "tracing" of a premarital asset so as to set it aside to the party who owned it at the time of the marriage. But in out view, the "disposable" nature of a cow does not, by itself, mean that a set-aside for preowned cattle is not allowable. Instead, it seems to us that the issue is resolved according to the particular facts of the case.
In the case before us, the testimony is undisputed that Layne has been involved in the cattle business continuously throughout the marriage, starting with his preowned herd, and that the proceeds from the sale of cattle have been reinvested in replacement cattle  producing the herd that existed at the time of the divorce. Obviously, the herd has grown in number and value during the marriage. And we note that Kristi does not dispute the premarital valuation of Layne's cattle or the value of the cattle at the time of the dissolution. Given the undisputed evidence concerning the cattle herd which we have recounted above, the controlling precedent on set-aside of premarital assets, and the fact that this is an equitable mater, we can discern no reason not to set aside to Layne that portion of the value of the present cattle herd which is attributable to Layne's premarital cattle. In doing so, we view the cattle herd as in effect a single asset  rather than taking a "cow by cow" approach to the tracing issue. Thus, we believe we have simply acknowledged the realities of what happens over time in a cattle operation. In short, while an individual cow which Layne owned in 1991 was long ago turned into hamburger, hot dogs, and shoe leather and thus is not traceable, the cattle herd itself, which has always been part of Layne's farming operation, is in fact traceable. To do otherwise seems to us to exalt form over substance and ignore the equitable nature of a dissolution action. Therefore, the trial court should have set aside to Layne the sum of $59,600 to account for the cattle herd he brought into the marriage.
The change in the property division attributable to this modification is as follows: The trial court found that the total net marital estate was $456,312, which when reduced by $59,600 becomes $396,712. Thus, half of the net marital estate is $198,356. The trial court awarded Kristi $197,725 as her "net marital estate award" and an equalizing payment of $30,431, which we reduce to $631, which gives Kristi a total of $198,356  one-half of the net marital estate. Layne shall pay such $631 to Kristi within 30 days of the entry of our mandate. In ail other respects, we affirm the trial court's property division.

Alimony.
The trial court awarded Kristi alimony at the rate of $40 per month for 78 months, beginning July 1, 2005, for an aggregate of $3,120. In the decree of dissolution, the trial court initially said that "the duration of the marriage supports an award of alimony.... Further, the relative economic circumstances of the parties support a finding that while alimony for Kristi is warranted, due to the interruptions in her employment made during the marriage, it should be low in amount."
In discussing alimony, the trial court found that the parties made essentially equal contributions to the marriage, including care of children, and our review of the record certainly justifies that conclusion. Layne argues that when the statutory factors for an award of alimony set forth in Neb.Rev.Stat. § 42-365 (Reissue 2004) are examined, there is no justification for even this rather insignificant sum of alimony, and we agree. Despite the trial court's finding to the contrary, there *180 is absolutely no evidence of any interruption of employment or educational pursuits by Kristi. She is well educated, with a bachelor's degree, as opposed to Layne, who has just a high school diploma and has farmed all of his adult life. Without reciting Kristi's work experience, it is apparent that she has worked in a number of capacities and has extensive job experience. Kristi testified that she did not interrupt a career or any education in order to marry Layne. In addition to the lack of evidence to support an award of alimony, the economic circumstances of the parties do not justify an alimony award, even of $40 per month.
The trial court determined Kristi's net monthly income to be $2,516 and Layne's to be some $600 less per month at $1,900. With respect to the duration of the marriage as justification of an alimony award, we frankly do not see how "duration of the marriage" operates to justify an alimony award in this case-and particularly to Kristi. Kristi and Layne were both in the same marriage for the same period of time, and the statute does not tell us in whose favor this factor cuts. Of considerably more import are the relative economic circumstances of the parties and the interruption of careers and education. The latter is not a factor, given the absence of evidence, and the economic circumstances would favor an award of alimony to Layne before an award of alimony to Kristi. While the $40 is arguably an inconsequential sum, the fact is that the record does not justify an award of any alimony to Kristi. The district court's award of alimony is unsupported by the record, is untenable, and is an abuse of discretion, and we hereby vacate the alimony award.

CONCLUSION
We modify the decree to provide that Layne shall pay Kristi the sum of $631 within 30 days of our mandate so as to equalize the division of the marital estate. We further modify the decree to eliminate the award of alimony to Kristi. In all other respects, we affirm the decree.
AFFIRMED AS MODIFIED.