who may be guest passengers. In fact, we read the list provided in the statute to be an explanation of the type of relative that is within the second degree of relation to the owner or operator of the vehicle, whether the relationship be one of consanguinity or one of affinity.

Based on our review, we conclude that Faye and Eugene were related within the second degree of affinity. As a result of Faye's marriage to Gordon, Eugene's son, Eugene was Faye's father-in-law and the two were related within the second degree of affinity pursuant to the language of § 25-21,237. Because Faye and Eugene were related within the second degree of affinity, Faye was a guest passenger and is prohibited from recovering any damages resulting from the September 2009 automobile accident. We affirm the decision of the district court to grant Gordon's motion for summary judgment and to dismiss Faye's complaint with prejudice.

## VI. CONCLUSION

Pursuant to § 25-21,237, Faye was a guest passenger in Eugene's automobile at the time of the accident in September 2009. As a result, Faye is prohibited from recovering any damages arising from that automobile accident. We affirm the decision of the district court to dismiss Faye's complaint with prejudice.

Affirmed.

———————

Brent Bussell, appellant and cross-appellee, v.
Sheri Bussell, appellee and cross-appellant.

___ N.W.2d ___

Filed September 17, 2013.    No. A-12-713.

1. **Divorce: Child Custody: Child Support: Property Division: Alimony: Attorney Fees: Appeal and Error.** In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion.

2. **Judges: Words and Phrases.** A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

3. **Divorce: Property Division.** Under Neb. Rev. Stat. § 42-365 (Reissue 2008), the equitable division of property is a three-step process. The first step is to classify the parties' property as marital or nonmarital. The second step is to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365.

4. ____: ____. The ultimate test in determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case.

5. ____: ____. Property which one party brings into the marriage is generally excluded from the marital estate.

6. ____: ____. The manner in which property is titled or transferred by the parties during the marriage does not restrict the trial court's ability to determine how the property should be divided in an action for dissolution of marriage.

7. ____: ____. When awarding property in a dissolution of marriage, property acquired by one of the parties through gift or inheritance ordinarily is set off to the individual receiving the gift or inheritance and is not considered a part of the marital estate. An exception to the rule applies where both of the spouses have contributed to the improvement or operation of the property which one of the parties owned prior to the marriage or received by way of gift or inheritance, or the spouse not owning the property prior to the marriage or not receiving the gift or inheritance has significantly cared for the property during the marriage.

8. **Divorce: Property: Words and Phrases.** "Dissipation of marital assets" is defined as one spouse's use of marital property for a selfish purpose unrelated to the marriage at the time when the marriage is undergoing an irretrievable breakdown.

9. **Divorce: Property Division.** Marital assets dissipated by a spouse for purposes unrelated to the marriage should be included in the marital estate in dissolution actions.

10. **Divorce: Property Division: Alimony.** In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party.

11. **Alimony: Appeal and Error.** In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result.

12. **Alimony.** Alimony should not be used to equalize the incomes of the parties or to punish one of the parties.

13.  ____. In determining whether alimony should be awarded, in what amount, and over what period of time, the ultimate criterion is one of reasonableness.

14.  ____. The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate.

15.  **Divorce: Attorney Fees.** In a marital dissolution action, an award of attorney fees depends on a variety of factors, including the amount of property and alimony awarded, the earning capacity of the parties, and the general equities of the situation.

Appeal from the District Court for Chase County: David Urbom, Judge. Affirmed as modified.

James C. Bocott, of Law Office of James C. Bocott, P.C., L.L.O., for appellant.

Larry R. Baumann and Angela R. Shute, of Kelley, Scritsmier & Byrne, P.C., for appellee.

Inbody, Chief Judge, and Irwin and Moore, Judges.

Moore, Judge.

## I. INTRODUCTION

Brent Bussell appeals, and Sheri Bussell cross-appeals, from the decree of dissolution entered by the district court for Chase County dissolving the parties' marriage. The parties challenge certain aspects of the district court's determination and division of the marital estate. Sheri also assigns error to the court's calculation of child support, failure to order Brent to pay health insurance premiums, and awards of alimony and attorney fees. For the reasons set forth herein, we affirm as modified.

## II. BACKGROUND

The parties were married on August 5, 1995. They have two minor children, Ashlin Bussell, born in 1996, and Jadin Bussell, born in 1998. The parties separated in 2010. Brent filed a complaint for dissolution of marriage on July 5, 2010.

Sheri received $1,400 per month in temporary child support. It is not clear from the record on appeal whether the child support was voluntary or court ordered or when the payments began. On October 3, 2011, the district court ordered Brent to

pay Sheri additional temporary spousal support of $1,500 per month beginning on October 1.

The dissolution trial was held on January 18 and 19, 2012. Prior to trial, the parties entered into a parenting plan concerning custody and parenting time, which plan was received into evidence by the district court. The court heard evidence on the parties' assets and debts, child support, alimony, and attorney fees. Specifically, the district court received documentary exhibits and heard testimony from witnesses, including the parties, Brent's brother and father, Brent's accountant, and two real estate appraisers. We summarize only the evidence relevant to the contested issues on appeal.

Sheri was employed when the parties married, but she quit working outside the home shortly before Ashlin was born. Thereafter, Sheri became the primary caregiver and performed most of the household chores, while Brent continued to work for his father on the family farm and earn the income for the parties' monthly expenses. The parties mutually decided that it would be best for Sheri to stay home with the children, and they could financially afford for her to do so. Sheri did not return to work until 2003 or 2004, after Jadin was enrolled in school. Sheri took medical transcription courses online and also obtained a certified nursing assistant certificate or degree. She began courses for a nursing degree in 2007, but she quit because it was difficult for the children to have her gone. At the time of trial, Sheri was working at a Chase County clinic, earning $10.28 per hour. Her gross wages for 2011 were $18,194.99.

Sheri testified that she wanted to pursue an advanced directive registered nurse degree, which would take 3 years to complete. She testified that it would cost about $11,000 a year plus mileage to either Sterling, Colorado, or North Platte, Nebraska, to receive such degree. She testified that opportunities for a registered nurse in Chase County are minimal compared to other areas, but that there are two nursing homes, a hospital, and a clinic in the county. The starting salary for a full-time registered nurse in Chase County would be $19 an hour.

Sheri testified about the ways she helped out on the farm during the marriage. She took lunches to the field so that the children could see Brent, made sure he had meals and clean clothes, helped move people and vehicles to different fields, picked up parts at several stores, delivered utility checks and loan payments, made bank deposits, picked up grain checks, and rode in the "semi" to deliver grain. In addition, she made sure all of the parties' personal bills were paid and mailed, maintained their house and yard, and reminded Brent of the children's activities.

Brent graduated from high school in 1985 and obtained his associate's degree in production agriculture in 1987. Brent worked for approximately a year in Colorado before returning to Nebraska in 1988 or 1989 to work for the family farming partnership. Brent's father formed an informal family farming partnership with Brent and Brent's brother. Brent and his brother were each given a 20-percent interest in the partnership, and Brent's parents had the remaining 60-percent interest. Brent did not pay anything or provide any particular consideration for his interest in the partnership. Brent has had no other employment since that time. Brent later received an additional 5-percent interest in the partnership, for a total of 25 percent. The partnership was formalized in February 2010 as Bussell Farms.

The partnership owns grain and equipment, including machinery, tools, and supplies. Evidence was presented to value Brent's 20-percent interest in the equipment that was owned by the partnership prior to his marriage in 1995 and to value his 25-percent interest at the time of trial. Specifically, the evidence included a farm equipment appraisal prepared by an appraisal service. The appraisal identifies the farm equipment owned by the partnership on the date of the marriage in 1995 and the equipment owned by the partnership as of September 29, 2011. The appraisal valued the premarital farm equipment at $955,850. It valued the equipment owned as of September 2011 at $1,982,200. The record shows that the partnership regularly buys and sells farm equipment at the end of each year.

The partnership's sole source of income is from the sale of grain. The partners each receive their respective percentage of the income from the grain sales, which they deposit into their own bank accounts, and the partners each pay their respective share of expenses associated with the grain production. At the time of trial, all of the 2011 beans and corn had been harvested and the wheat planted in 2011 remained in the fields to be harvested in 2012. It appears from the record that all of the 2011 beans had been sold by the time of trial. Some of the 2011 corn had been sold, and the remainder was stored in grain bins owned by the partnership. Of the stored corn, 95 percent had been contracted for sale. Depending on shrinkage that occurs in the bins, there may be remaining approximately 10,000 bushels of corn that had not yet been contracted or sold at the time of trial. Although not clear from the entire record, it appears from exhibit 71 that approximately 175,000 bushels of corn under contract were set to be delivered in January, February, and March 2012, after which the partners would receive their respective shares of the gross revenues. However, it appears from the record that the partnership had received significant income in early January 2012 and it is not clear whether this revenue derived from any of the contracted corn shown in exhibit 71.

The parties' tax returns from 2005 to 2010 were received in evidence. The 2011 tax return had not yet been prepared at the time of trial. According to Brent and his brother, the 2011 corn crop suffered significant hail damage, which cut the yield approximately in half compared to previous years. Brent expects that the revenue from the 2011 crops will be dramatically reduced because of the hail losses and that the impact will be felt for the next 2 years, a consequence that is not within his control. In addition, approximately 75 percent of the 2011 seed wheat was totally hailed out and the remainder was damaged.

At the time of the marriage, Brent owned an undivided one-fourth interest in an acreage in Chase County. The acreage included a house, garage, and steel building. During the marriage, Brent's parents gifted him the remaining three-fourths

interest in the acreage. In 1997, Brent executed a deed for the property to Brent and Sheri as joint tenants with right of survivorship. Brent testified that when he executed the deed, it was not his intent to make a gift to Sheri of one-half of the property; rather, he placed her name on the property because Sheri was concerned that she would lose the property if Brent died.

The parties lived in the house on the acreage for about 8 years. Sheri testified that they made and paid for many improvements to the home, including a new roof, siding, windows, upstairs carpet, downstairs bathroom and bedroom carpet, a furnace, and central air conditioning. They also tore out and replanted trees, and they poured a concrete floor in the steel building on the property, which floor cost over $20,000. Sheri testified that they also spent $20,000 on a kitchen remodel, which included custom-made oak cabinets, new flooring, and new appliances. Finally, they put in a sprinkler system that cost about $5,000. The parties sold the property in 2003 for $120,000. They used the $120,000 in the construction of the marital home, where Sheri was residing at the time of trial and which was awarded to her in the division of property.

After the parties separated, Brent purchased a house for $156,000 and took out two loans for the full purchase amount. He purchased a 2010 Chevrolet Avalanche for his personal use. The house and vehicle, along with their corresponding debts, were included in the marital estate and assigned to Brent. Brent also purchased some household goods and furnishings for his new home, although it is not clear whether these items were listed in the court's division of property.

We have set forth additional details of the evidence at trial as necessary to our resolution of this appeal in the analysis section below.

The district court entered a decree of dissolution on May 18, 2012. The court approved the parties' parenting plan, and pursuant to that plan, it awarded custody of Ashlin to Sheri and custody of Jadin to Brent, subject to each party's rights of visitation with the other child as specified in the parenting plan. The court ordered Brent to pay Sheri child support of $816

per month, commencing June 1, pursuant to a split custody calculation. The court also ordered child support to increase to $1,431 when there was only one minor child remaining. We note that this portion of the child support award was later corrected through the court's order on the parties' motions for new trial. In calculating child support, the court assigned Sheri total monthly income of $1,782, with a net monthly income of $1,629.91, and Brent total monthly income of $11,153.93, with a net monthly income of $8,737.35. The court ordered Brent to pay 84 percent and Sheri to pay 16 percent of any medical, orthodontic, ophthalmic, and dental expenses not covered by insurance, in excess of $480 per year per child.

The district court gave Brent credit for his 20-percent premarital interest in the partnership equipment, which the court valued at $191,170, and for the gift of the additional 5-percent interest, which the court valued at $99,110. The court also gave Brent credit for the $120,000 from the sale of the Chase County acreage. The court awarded Brent two quarter sections of pivot-irrigated real property as marital property, which real estate was used by the partnership, and valued Brent's interest in those tracts at $135,937.50 and $775,000. The court also awarded Brent his farm bank account, valued at $418,413.78 as of January 11, 2012, as well as other miscellaneous property. In dividing the marital estate, the court assigned property and debt to Brent totaling $1,692,246.73 and property and debt to Sheri totaling $353,066.57. In order to equalize the division of the marital estate, the court ordered Brent to pay Sheri $650,000 and set forth provisions for the payment of the judgment.

Finally, the district court awarded Sheri alimony and attorney fees. The court ordered Brent to pay Sheri alimony of $1,500 per month, beginning July 1, 2012, and continuing for a total of 96 months. The court noted Sheri's request for attorney fees in the amount of $70,000. The court also noted the evidence that Sheri withdrew $100,000 from Brent's farm account and $18,264 from the parties' savings account, and took $1,800 in cash from the marital home at the time of the separation, which sums were used by Sheri for her living expenses during the separation. The court awarded attorney fees of $10,000, but

inadvertently ordered the payment of these attorney fees from Sheri to Brent, instead of from Brent to Sheri.

The parties filed motions for new trial, and on July 10, 2012, the district court entered an order amending the decree to order Brent to pay Sheri attorney fees of $10,000 and amending its child support award to order Sheri to pay Brent child support of $267 per month at the time when there is only one minor child remaining. Brent subsequently perfected his appeal to this court and Sheri her cross-appeal.

## III. ASSIGNMENTS OF ERROR

Brent asserts that the district court erred in valuing his interest in the partnership farm equipment at $734,512.50.

On cross-appeal, Sheri asserts that the district court erred in (1) calculating the value of certain premarital assets of Brent and dividing the marital estate, (2) calculating child support and failing to order Brent to pay health insurance for Sheri for 6 months following the dissolution and for the minor children, (3) failing to award alimony for a period of 10 years, and (4) awarding Sheri attorney fees of only $10,000.

## IV. STANDARD OF REVIEW

[1,2] In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion. *Mamot v. Mamot*, 283 Neb. 659, 813 N.W.2d 440 (2012). A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Fisher v. PayFlex Systems USA*, 285 Neb. 808, 829 N.W.2d 703 (2013).

## V. ANALYSIS

We begin our analysis with the parties' assignments of error regarding property division. Both parties challenge certain aspects of the valuation of Brent's interest in the partnership farm equipment, and Sheri also challenges the credit given

to Brent for the premarital acreage, the failure of the court to include partnership grain as a marital asset, Brent's alleged failure to account for certain checks received while the divorce was pending, and Brent's alleged dissipation of assets during the pendency of the action.

### 1. Valuation of Premarital Assets and Division of Marital Estate

[3-5] Under Neb. Rev. Stat. § 42-365 (Reissue 2008), the equitable division of property is a three-step process. The first step is to classify the parties' property as marital or nonmarital. The second step is to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *Plog v. Plog*, 20 Neb. App. 383, 824 N.W.2d 749 (2012). The ultimate test in determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case. *Id*. Property which one party brings into the marriage is generally excluded from the marital estate. *Gress v. Gress*, 271 Neb. 122, 710 N.W.2d 318 (2006).

### (a) Valuation of Farm Equipment

Both parties assign error to the district court's valuation of Brent's interest in the partnership farm equipment. We address Brent's argument first and then Sheri's.

### (i) Brent's Argument

Brent asserts that the district court erred in valuing his interest in the partnership farm equipment at $734,512.50.

In the decree, the district court, using the values from the appraiser, found that the premarital partnership equipment was worth $955,850, found that Brent's 20-percent premarital interest was $191,170, and excluded this value from its calculation of the marital estate. The court then found that the current value of the partnership equipment was $1,982,200, found that Brent's gifted 5-percent interest was valued at $99,110, and excluded that value from the marital estate. Brent does not take issue with these valuations and calculations. Rather, he asserts that the court erred in calculating his 25-percent

interest in the current partnership equipment at $734,512.50, as reflected in the court's recapitulation chart contained in the decree. We agree with Brent that based on the court's valuation of the current partnership equipment in the decree at $1,982,200, Brent's 25-percent interest should be $495,550 ($1,982,200 × .25). We have reviewed the record and Brent's arguments and agree that the court erroneously included a different figure in the chart than is supported by the evidence and reflected in the valuations contained in the body of the decree. Accordingly, we modify the marital asset division chart to reflect that Brent's 25-percent interest in the Bussell Farms equipment is $495,550.

### (ii) Sheri's Argument

Sheri does not dispute that Brent should be given credit for his premarital interest in the partnership equipment, but she argues that he should be given credit only for his interest in the premarital equipment still owned by the partnership at the time of the dissolution.

In deciding to exclude the value of Brent's premarital interest in the equipment from the value of the interest in the equipment owned at the time of trial, the district court relied on this court's decision in *Shafer v. Shafer*, 16 Neb. App. 170, 741 N.W.2d 173 (2007), a case involving the setoff of premarital cattle. In that case, the husband's practice had been to sell cattle and purchase replacement cattle or additional cattle. The husband owned cattle at the time of the marriage, and throughout the marriage, the proceeds from the sale of cattle were reinvested in replacement cattle, producing the herd owned at the time of the divorce. In finding that the setoff should have been allowed, we stated:

> Given the undisputed evidence concerning the cattle herd which we have recounted above, the controlling precedent on set-aside of premarital assets, and the fact that this is an equitable matter, we can discern no reason not to set aside to [the husband] that portion of the value of the present cattle herd which is attributable to [his] premarital cattle. In doing so, we view the cattle herd as in effect a single asset—rather than taking a "cow by cow" approach

to the tracing issue. Thus, we believe we have simply acknowledged the realities of what happens over time in a cattle operation. In short, while an individual cow which [the husband] owned in 1991 was long ago turned into hamburger, hot dogs, and shoe leather and thus is not traceable, the cattle herd itself, which has always been part of [his] farming operation, is in fact traceable. To do otherwise seems to us to exalt form over substance and ignore the equitable nature of a dissolution action.

*Id*. at 178, 741 N.W.2d at 179.

Although we are dealing with the replacement of farm equipment as opposed to cattle, we find no abuse of discretion in the district court's reliance on *Shafer* under the particular facts of this case. The record shows that Brent, his brother, and his father would regularly trade and upgrade the partnership equipment. The court did not err in setting aside $191,170 and giving Brent credit for this amount as his 20-percent premarital interest in the equipment.

### (b) Proceeds from Sale of Acreage

Sheri argues that Brent should not have been given credit for the $120,000 from the sale of the acreage that was then used to purchase the marital home.

Prior to the marriage, Brent owned an undivided one-fourth interest in an acreage in Chase County, and during the marriage, Brent's parents gifted him the remaining three-fourths interest. Brent thereafter deeded the property to himself and Sheri. Brent testified that he did not intend to make a gift of the property to Sheri by placing her name on the deed, but only wished to make her a joint owner with right of survivorship in the event he were to meet an untimely death. Brent's father also testified that he did not intend to make a gift to Sheri at the time of the conveyance and that he wanted the property to remain in the family. There is no evidence in the record of the value of the property at the time it was gifted to Brent; the only evidence of value is that the property was sold in 2003 for $120,000. There is no dispute that the $120,000 was applied to the purchase of the marital home, which Sheri is receiving in the property division.

[6] Sheri argues that Brent's conveyance of the property to the parties jointly showed an intent to turn the property into marital property. However, the manner in which property is titled or transferred by the parties during the marriage does not restrict the trial court's ability to determine how the property should be divided in an action for dissolution of marriage. *Plog v. Plog*, 20 Neb. App. 383, 824 N.W.2d 749 (2012).

[7] Sheri also argues that an exception to the rule concerning the treatment of gifted property should apply in this case. When awarding property in a dissolution of marriage, property acquired by one of the parties through gift or inheritance ordinarily is set off to the individual receiving the gift or inheritance and is not considered a part of the marital estate. An exception to the rule applies where both of the spouses have contributed to the improvement or operation of the property which one of the parties owned prior to the marriage or received by way of gift or inheritance, or the spouse not owning the property prior to the marriage or not receiving the gift or inheritance has significantly cared for the property during the marriage. *Id*. When applying this exception, evidence of the value of the contributions and evidence that the contributions were significant are generally required. See *id*. See, also, *Tyler v. Tyler*, 253 Neb. 209, 570 N.W.2d 317 (1997).

Although there is evidence in the record that the parties made certain improvements to the acreage during the time that they lived there and evidence of the cost associated with some of those improvements, there is no evidence to show the value of these improvements, that these improvements were significant, or that they resulted in an increase in the value of the property between the time the property was gifted to Brent and its sale. We find no error in the district court's treatment of the acreage as Brent's premarital or gifted property and in the credit to Brent of $120,000.

### (c) Brent's Interest in
### Partnership Grain

Sheri argues that the district court erred in not considering Brent's interest in the partnership grain to be a marital asset. The evidence at trial showed that all of the 2011 beans and

corn had been harvested and that virtually all of the corn had been either sold or contracted. Some of the partnership's contracted corn remained in the bins at the time of trial and was scheduled to be delivered to the buyers in the next couple of months. At the time of trial, the only growing crop was wheat. The evidence also showed that all of the crop insurance payments for 2011, except for one of approximately $6,000, had been received and deposited. After reviewing the evidence, the court found that the stored crops should not be treated as a divisible marital asset.

In *Kalkowski v. Kalkowski*, 258 Neb. 1035, 1042, 607 N.W.2d 517, 524 (2000), the Nebraska Supreme Court declined "to adopt any bright-line rule as to whether or not crops which will eventually generate income may be treated as divisible marital property in a dissolution proceeding." In *Kalkowski*, the Supreme Court found that inclusion of the growing and stored crops in the marital estate was not an abuse of discretion, primarily because the husband had valued these assets and asked to be awarded them in the division of the marital estate.

In this case, Brent did not value the stored crops as part of the marital estate and, in fact, he testified that awarding Sheri one-half of his portion of the partnership grain would amount to an award of half of his income for the upcoming year, which would have a significantly negative impact upon his ability to meet his farm expense obligations. The record shows that the only thing the partnership does to produce income is sell grain and that this is Brent's only source of income. When the remaining 2011 corn is delivered to the buyers in 2012, Brent will receive his respective portion of the proceeds, which will be included in his 2012 income. In fact, Brent received a portion of the proceeds from the stored grain in January 2012, shortly before trial. Brent argues that including the remaining stored grain in the marital estate valuation would amount to "double-dipping," because his child support and alimony payments are based upon and paid from his income derived from the sale of grain.

It was within the court's discretion as to whether the stored grain in this case would be treated as a divisible marital asset.

The court declined to do so, and under the circumstances of this case, we find no abuse of discretion. Even if we were to consider Brent's portion of the 2011 stored grain as a marital asset, it is not clear from this record what the total value of the stored grain was at the time of trial, since some of the stored grain shown on various exhibits had recently been sold and the revenue distributed to the partners. Further, it was not clear from the record what Brent's share of the expenses were in connection with the production of this 2011 grain, which should be considered in arriving at the net value of the stored grain. See *Gebhardt v. Gebhardt*, 16 Neb. App. 565, 746 N.W.2d 707 (2008) (rejected inclusion of gross value of corn crop while ignoring all costs associated with planting, fertilizing, watering, and harvesting).

We reject Sheri's argument that the district court abused its discretion in its decision to not include the stored grain in the division of the marital estate.

#### (d) Checks Received While
#### Divorce Pending

Sheri argues that Brent failed to disclose or account for a number of checks he received while the divorce was pending. She first points to a check for $58,699 for hail insurance proceeds that was issued in September 2011, but not deposited by Brent until a week before trial. However, this $58,699 deposit was included in the bank account awarded to Brent in the division of marital assets, as reflected in exhibit 94. Sheri also notes an insurance check for $38,775 that Brent stated he deposited into one of his accounts but which deposit he was unable to locate when reviewing copies of his statements at trial. Brent testified it was possible that when he copied his bank statements, he missed copying information on the back of a page, but in any event, he thought it had been deposited.

Other than stating that Brent failed to disclose or account for these crop insurance checks, Sheri presents no argument in support of this portion of her assignment of error. As noted above, the $58,699 check had been deposited and was included in the division of assets. We can find nothing in the record to

suggest that the handling of these checks was anything other than in the normal course of the farm's business or that Brent was hiding assets. This argument is without merit.

### (e) Dissipation of Marital Assets

[8,9] Sheri argues that Brent dissipated some marital assets following the parties' separation. "Dissipation of marital assets" is defined as one spouse's use of marital property for a selfish purpose unrelated to the marriage at the time when the marriage is undergoing an irretrievable breakdown. *Reed v. Reed*, 277 Neb. 391, 763 N.W.2d 686 (2009). Marital assets dissipated by a spouse for purposes unrelated to the marriage should be included in the marital estate in dissolution actions. *Id*.

Sheri points to trips Brent took to Las Vegas, Nevada, and Alabama, certain charges he made in Las Vegas, and his purchase of a television and a vehicle. She argues that these and any other substantial withdrawals made by Brent from the parties' joint account following their separation should be taken into account in the division of the marital estate.

The record shows that both parties made withdrawals from their joint account at or near the time of separation, and we find no error in the district court's failure to consider these withdrawals in the division of the marital estate. In this regard, we note that the court determined prior to trial to value the marital estate as of the date of trial. With regard to Brent's purchase of a vehicle postseparation, this vehicle and the corresponding debt were included in the court's division of the marital estate, as were the home and associated debt purchased by Brent after the separation.

Brent testified that he went to Las Vegas once following the separation and that he also took a friend to Alabama to look at a truck. However, no evidence was presented to indicate the cost of these trips, other than a credit card charge at a restaurant and an automated teller machine withdrawal totaling $1,600. Brent purchased a television and stand in the process of furnishing his new house for approximately $1,800, which does not appear to be listed on the court's property division. After considering the overall division of this relatively large

marital estate, we find no error in the district court's treatment of these items addressed in this assignment of error.

### (f) Conclusion Regarding Property Valuation and Division

Based on the above analysis and our finding regarding the value of Brent's interest in the partnership equipment, we modify the total value of the marital property assigned to Brent to $1,641,934.23. Once the debts assigned to Brent of $188,650 are subtracted, Brent's net portion of the marital estate becomes $1,453,284.23. When Sheri's net portion of the marital estate ($353,066.57) is subtracted from Brent's net portion, the difference is $1,100,217.66. Half of this amount is $550,108.83. We note that in the court's original calculation of the equalization payment, one-half of the difference between the parties' net awards was $669,590, which the court rounded down to $650,000 due from Brent to Sheri. Similarly, we determine that the property equalization payment reflected in the decree should be reduced from $650,000 to the rounded figure of $550,000. We modify the decree to enter judgment against Brent in favor of Sheri for that amount. We modify the provision of the decree regarding the payment of the property equalization payment to provide that Brent shall pay to Sheri, on or before October 1, 2012, the sum of $50,000 without interest. The balance of the judgment of $500,000 shall draw interest from the date of the decree and shall be paid in five equal annual principal installments of $100,000 each. In addition to the annual principal installment, Brent shall pay any accrued interest at the judgment rate of 2.142 percent per annum. The first annual payment shall be made on or before March 1, 2013, and a like amount plus accrued interest on the first day of each March thereafter until the full amount of the judgment plus the accrued interest is paid.

### 2. Child Support and Health Insurance

Sheri asserts that the district court erred in calculating child support and failing to order Brent to pay health insurance for Sheri for 6 months following the dissolution and for the minor children.

### (a) Brent's Income for Child
### Support Purposes

Sheri argues that the district court erred in determining Brent's income for child support purposes. She takes issue with the deduction of depreciation expenses from Brent's income and the court's averaging of Brent's income. In calculating child support, the court assigned Brent total monthly income of $11,153.93 and net monthly income of $8,737.35.

### *(i) Depreciation*

With respect to depreciation, the Nebraska Child Support Guidelines provide:

> Depreciation calculated on the cost of ordinary and necessary assets may be allowed as a deduction from income of the business or farm to arrive at an annualized total monthly income. After an asset is shown to be ordinary and necessary, depreciation, if allowed by the trial court, shall be calculated by using the "straight-line" method, which allocates cost of an asset equally over its useful duration or life. . . . A party claiming depreciation shall have the burden of establishing entitlement to its allowance as a deduction.

Neb. Ct. R. § 4-204.

Brent's income tax returns for 2005 to 2010 were admitted into evidence. We note that Brent complied with § 4-204 of the guidelines, which requires any party claiming an allowance of depreciation as a deduction from income to furnish a minimum of 5 years' tax returns. Brent also offered testimony from his accountant, Jeffrey Olsen. Olsen examined Brent's prior tax documents and testified about how Brent had been claiming depreciation on farm and business equipment. Olsen testified that in many of the past few years, Brent had been using the "fast write off" method for the section 179 elections to expense a lot of the equipment purchases in the year that they were purchased. Olsen opined that this may not accurately reflect Brent's income in recent years. In an effort to comply with the above guideline regarding depreciation deduction, Olsen recalculated Brent's depreciation schedules using a straight-line method from 2005 to 2010, which

recalculation of depreciation was received in evidence. Olsen testified that in order to arrive at an adjusted net farm profit for Brent for purposes of determining child support income, the claimed depreciation on schedule F should be added back to the net profit and then the straight-line depreciation should be deducted.

We summarize Brent's schedule F documents from his tax returns for 2006 to 2010 (5 years) and Olsen's recalculation to arrive at the adjusted net farm profit as follows:

|  | **Net Profit** + | **Depreciation** − | **Straight-Line** = | **Adj. Net** |
|---|---|---|---|---|
|  | **(Sch. F)** | **(Sch. F)** | **(Olsen)** | **Profit** |
| 2006 | $ 67,394 | $ 43,778 | $33,810 | $ 77,362 |
| 2007 | 80,132 | 47,384 | 35,061 | 92,455 |
| 2008 | 95,758 | 51,115 | 39,098 | 107,775 |
| 2009 | 115,485 | 131,495 | 47,505 | 199,475 |
| 2010 | 127,858 | 127,306 | 62,995 | 192,169 |

While the district court did not specifically articulate how it arrived at its calculation of Brent's monthly income, it is apparent from our chart above that the court averaged the adjusted income from 2006 to 2010 ($669,236 ÷ 5 years = $133,847.20 ÷ 12 months = $11,153.93). We conclude that the district court properly allowed and determined the depreciation deduction from Brent's farm income to arrive at his monthly income as provided in the guidelines. Sheri's argument to the contrary is without merit.

### (ii) Income Averaging

The next question we must address is whether the district court properly averaged Brent's income in calculating child support. As shown above, the court apparently utilized a 5-year average in determining Brent's monthly income. Sheri argues that because Brent's income is steadily increasing, the use of income averaging was error.

The Nebraska Supreme Court first discussed the propriety of using income averaging in determining a parent's income for purposes of setting child support in *Peter v. Peter*, 262 Neb. 1017, 637 N.W.2d 865 (2002). The court recognized that a footnote to worksheet 1 of the guidelines provided that "'[i]n the event of substantial fluctuations of annual earnings

of either party during the immediate past 3 years, the income may be averaged to determine the percent contribution of each parent . . . .'" *Peter v. Peter*, 262 Neb. at 1023-24, 637 N.W.2d at 872. The father-obligor in *Peter* was working on commission as a stockbroker and successfully convinced the trial court to average his last 3 years of income in modifying his child support obligation. The Supreme Court found the income averaging to be error because the father's annual earnings showed a clear pattern of consistently increasing income. In reaching this conclusion, the court noted that there was no evidence in the record to suggest the father's current rate of earnings would decrease and that in fact, there was evidence to suggest that his income would continue to increase. This court applied the same rationale in a situation where the father-obligor's income was steadily declining, finding that income averaging was not appropriate. See *State on behalf of Hannon v. Rosenberg*, 11 Neb. App. 518, 654 N.W.2d 752 (2002). See, also, *Lucero v. Lucero*, 16 Neb. App. 706, 750 N.W.2d 377 (2008) (income averaging not appropriate where father-obligor's W-2 statements for only 2 years do not show that his income has substantially fluctuated).

On the other hand, several cases have allowed the use of income averaging when dealing with farm income. The Nebraska Supreme Court addressed the issue of income averaging for a farmer in *Gress v. Gress*, 274 Neb. 686, 743 N.W.2d 67 (2007). The husband-obligor had annual income which fluctuated the 3 years prior to trial from $51,654 to $61,059 to $28,400, respectively. The Supreme Court recognized that as a self-employed farmer, the husband's income was prone to fluctuations from year to year, which is the type of contingency provided for in the guidelines. The court discussed at length the number of years that a court should use when averaging income pursuant to the guidelines, including an unpublished decision from this court that used a 5-year average, and decisions or recommendations from other jurisdictions that support the use of 2-, 3-, 4-, 5-, and 10-year averages. The court in *Gress* concluded that a 3-year average tended to be the most common approach in cases where a parent's income fluctuates and that courts appear reluctant to use more than a 5-year

average. In *Gress*, the trial court used a 3-year average rather than the 8-year average urged by the husband. The Supreme Court concluded that even assuming that income averaging under the Nebraska guidelines is not limited to a 3-year average, the district court did not abuse its discretion by declining to use an 8-year average. We note that the Supreme Court recently found no abuse of discretion in averaging a father-obligor's income over 4 years where the income was derived from investments and included both years of gain and years of losses. See *Mamot v. Mamot*, 283 Neb. 659, 813 N.W.2d 440 (2012).

In *Willcock v. Willcock*, 12 Neb. App. 422, 675 N.W.2d 721 (2004), this court affirmed a trial court's utilization of a 3-year income average in calculating the father-obligor's child support obligation. The father's income was derived from farming, "a profession that is subject to income fluctuations based on a variety of factors." *Id*. at 430, 675 N.W.2d at 727. The father testified about the variety of factors that affect his income, including the farm economy, weather conditions and crop yields, and government payments. The father's tax returns bore out such fluctuations, showing both increases and decreases over a 5-year period. Thus, we rejected the father's argument that his current income should be used as opposed to the 3-year average, distinguishing this case from *State on behalf of Hannon v. Rosenberg, supra*, where the father's income was derived from an hourly wage and no evidence existed to suggest that his pay decrease was temporary in nature. However, we also stated that "[t]his is not to say that the principles [income averaging not appropriate where income steadily increasing or decreasing] announced in *Peter v. Peter* . . . and *State on behalf of Hannon v. Rosenberg* could never be applicable in calculating the child support obligation of someone engaged in the farming profession." *Willcock v. Willcock*, 12 Neb. App. at 430, 675 N.W.2d at 727.

This court again found that income averaging was appropriate in determining a self-employed farmer's annual income in *Pohlmann v. Pohlmann*, 20 Neb. App. 290, 824 N.W.2d 63 (2012). A review of the evidence in that case showed that the father's income from farming was prone to fluctuations from

year to year, due in part to his use of the cash basis of account-
ing. Although the father's income showed a pattern of decline
for the 3 years prior to trial, we found merit to his argument
that the court should have used the average income reported on
his tax returns for the 3 years preceding trial, and we remanded
the cause to the district court to recalculate the father's income
and resulting child support obligation. See, also, *Hughes v.
Hughes*, 14 Neb. App. 229, 706 N.W.2d 569 (2005) (error
found in failure to include 4-year average of trust income in
calculating father's child support obligation).

Applying the foregoing principles to the case at hand, we
conclude that the district court did not abuse its discretion in
using a 5-year income average in determining Brent's income
and resulting child support obligation. While Brent's tax
returns for the past 5 years show that his income has steadily
increased, there is also evidence in the record to indicate that
Brent's farm income is subject to various factors outside of his
control which can cause fluctuations. The district court did not
err in setting Brent's total monthly income at $11,153.93 for
purposes of calculating his child support obligation.

### (b) Health Insurance

The district court made no ruling in the decree for the pro-
vision of health insurance for the children, nor did it include
an adjustment for health insurance premiums for the children
in its child support calculation. Sheri argues that the district
court erred in this regard and that Brent should be ordered
to pay all of the children's health insurance premiums in the
future and to pay for her health insurance for 6 months fol-
lowing the dissolution. She also argues that she should be
given credit for the health insurance premiums she paid dur-
ing the separation and following trial, including credit for
her own health insurance premium in the 6 months following
the dissolution.

Neb. Rev. Stat. § 42-369(2)(a) (Cum. Supp. 2012) provides
in part:

> If the party against whom an order, decree, or judg-
> ment for child support is entered or the custodial party
> has health insurance available to him or her through an

employer, organization, or other health insurance entity which may extend to cover any children affected by the order, decree, or judgment and the health care coverage is accessible to the children and is available to the responsible party at reasonable cost, the court shall require health care coverage to be provided.

The Nebraska Child Support Guidelines provide, "As required by . . . § 42-369(2), the child support order shall address how the parents will provide for the child(ren)'s health care needs through health insurance . . . ." Neb. Ct. R. § 4-215 (rev. 2011).

At trial, Sheri asked the district court to order Brent to pay all health insurance premiums for the children and to pay her health insurance premium for 6 months following the dissolution. Up through the date of trial, Sheri had been "covered by the family plan . . . through Brent." Sheri paid all of the health insurance premiums for the family after the divorce was filed in July 2010 to the time of trial. In an affidavit filed after trial and dated March 23, 2012, Sheri stated that the premium for the whole family is $778.46 per month and that she continued to pay the premiums after trial.

We agree that the district court erred in failing to address the provision of health insurance for the minor children in the decree. We modify the decree so that Brent is ordered to provide health insurance for the minor children, so long as such coverage is available to him through his health insurance policy at a reasonable cost, and is ordered to pay the premium for the children commencing on the date of the entry of the decree. However, because we do not have evidence of the cost to provide health insurance solely for the children, we are not able to make any adjustment to the child support calculation as allowed under § 4-215. We decline to require Brent to reimburse Sheri for premiums paid for the family during the pendency of the dissolution proceeding, because Sheri had both temporary support and the use of funds withdrawn from the parties' accounts during this time. Likewise, we decline to require Brent to reimburse Sheri for the premium associated with her health insurance coverage after the trial. First, we note

from the record before us that Sheri's request for reimbursement of premiums paid by her after the completion of the trial was not addressed by the trial court below, and as such, there is no error for us to review. Further, we note that Sheri was awarded alimony and a significant property award from which to pay for her health insurance.

### 3. ALIMONY

Sheri asserts that the district court erred in failing to award alimony for a period of 10 years. The court awarded Sheri alimony of $1,500 per month for 96 months, which is 8 years.

[10-14] In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. *Jensen v. Jensen*, 20 Neb. App. 167, 820 N.W.2d 309 (2012). In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. *Id*. Alimony should not be used to equalize the incomes of the parties or to punish one of the parties. *Smith v. Smith*, 20 Neb. App. 192, 823 N.W.2d 198 (2012). In determining whether alimony should be awarded, in what amount, and over what period of time, the ultimate criterion is one of reasonableness. *Id*. The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. *Id*.

The parties were married for over 15 years, and during the marriage, Sheri contributed by maintaining the parties' household, being the primary caregiver for their children, and providing assistance with the farming operation in various ways. Sheri quit working outside the home when the parties'

first child was born, becoming the primary caregiver and performing most of the household chores. This was a mutual decision by the parties. Sheri returned to work in 2003 or 2004. Sheri has taken medical transcription courses online and has obtained a certified nursing assistant certificate or degree. At the time of trial, Sheri was working at a Chase County clinic, earning $10.28 per hour, and her gross wages for 2011 were $18,194.99. Sheri plans to pursue an advanced directive registered nurse degree, which will take 3 years to complete. Although she testified that opportunities for a registered nurse in Chase County are limited, the starting salary for a full-time registered nurse would be $19 an hour, which is almost double her current wage. Sheri testified that she has monthly living expenses of $5,773.27. In addition to alimony and child support, Sheri has been awarded marital assets totaling $416,746.62. The only marital debt assigned to her is the mortgage on the marital home of $63,680.05, leaving a net marital estate of $353,066.57. Sheri is receiving property equalization payments of $550,000. Sheri will continue to receive alimony for a number of years after she has completed her 3-year nursing program. We find no abuse of discretion in the duration of the district court's alimony award.

### 4. Attorney Fees

[15] Sheri asserts that the district court erred in awarding her attorney fees of only $10,000. Although the court noted in the decree that Sheri requested attorney fees of $70,000, her actual request at trial was for $50,000 in attorney fees. In a marital dissolution action, an award of attorney fees depends on a variety of factors, including the amount of property and alimony awarded, the earning capacity of the parties, and the general equities of the situation. *Molczyk v. Molczyk*, 285 Neb. 96, 825 N.W.2d 435 (2013).

In awarding attorney fees to Sheri, the district court noted that at the time of the separation, Sheri took $100,000 from the parties' farm account, $18,264 from their savings account, and $1,800 in cash from the family home. Sheri testified at trial that she did so to protect herself and the children during the

separation and that she has used the money for living expenses, including paying the mortgage on the marital residence and health insurance premiums for Brent and the children. At the time of trial, she had only $17,984.75 remaining of the $100,000. However, Sheri also received temporary child support of $1,400 per month and spousal support of $1,500 per month during the pendency of the proceedings. And, she will continue to receive $1,500 in monthly alimony for 8 years. Finally, Sheri has received a significant award of property and equalization payments.

We have reviewed the record and find no abuse of discretion in the court's award of $10,000 in attorney fees to Sheri. Her assignment of error is without merit.

## VI. CONCLUSION

As discussed above, we modify the marital asset division chart to reflect that Brent's 25-percent interest in the Bussell Farms equipment is $495,550. We find no merit to the other assignments of error relating to the valuation of premarital assets, the credits given to Brent, and the division of the marital estate. We have modified the decree with respect to the property equalization payment as set forth above.

In determining Brent's income for child support purposes, the district court properly allowed and determined the depreciation deduction and did not abuse its discretion in using a 5-year income average in determining Brent's income and resulting child support obligation. Accordingly, the court did not err in setting Brent's total monthly income at $11,153.93 for purposes of calculating child support.

We modify the decree so that Brent is ordered to provide health insurance for the minor children, so long as such coverage is available to him through his health insurance policy at a reasonable cost, and is ordered to pay the premium for the children's health insurance commencing on the date of the entry of the decree. However, because we do not have evidence of the cost to provide health insurance solely for the children, we are not able to make any adjustment to the child support calculation. Further, we decline to require Brent to reimburse

Sheri for premiums paid during the pendency of the dissolution proceeding or after trial.

We find no abuse of discretion in the duration of the district court's alimony award or in its award of $10,000 in attorney fees to Sheri.

AFFIRMED AS MODIFIED.

————————————

SAM GRIMMINGER AND KAY GRIMMINGER, APPELLANTS,
V. JAMES MUDLOFF, APPELLEE.
___ N.W.2d ___

Filed September 17, 2013.    No. A-12-1000.

1. **Actions: Restrictive Covenants: Equity.** An action to enjoin a breach of restrictive use covenants is equitable in nature.
2. **Equity: Appeal and Error.** In an appeal of an equitable action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.
3. **Restrictive Covenants: Intent.** Restrictive covenants are to be construed so as to give effect to the intentions of the parties at the time they agreed to the covenants.
4. **Restrictive Covenants.** If the language of a restrictive covenant is unambiguous, the covenant shall be enforced according to its plain language, and the covenant shall not be subject to rules of interpretation or construction.
5. ____. Restrictive covenants are not favored in the law and, if ambiguous, should be construed in a manner which allows the maximum unrestricted use of the property.
6. **Contracts.** An ambiguity exists when the instrument at issue is susceptible of two or more reasonable but conflicting interpretations or meanings. Moreover, the fact that the parties have suggested opposing meanings of the disputed instrument does not necessarily compel the conclusion that the instrument is ambiguous.
7. **Restrictive Covenants: Words and Phrases.** A dwelling is a structure in which a person lives or that has been designed for living.
8. ____: ____. The term "residential" prohibits the affected real property from being utilized for commercial purposes.

Appeal from the District Court for Howard County: KARIN L. NOAKES, Judge. Affirmed.