IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

KUNNEMANN V. KUNNEMANN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

DEBORAH K. KUNNEMANN, APPELLEE,
V.
MARLON K. KUNNEMANN, APPELLANT.

Filed June 10, 2014.    No. A-13-276.

Appeal from the District Court for Chase County: DAVID URBOM, Judge. Affirmed.

Jeffrey S. Armour, of Armour Law, P.C., L.L.O., for appellant.

Gregory J. Beal for appellee.

MOORE, PIRTLE, and RIEDMANN, Judges.

MOORE, Judge.

Marlon K. Kunnemann appeals from the decree of dissolution entered by the district court for Chase County. In this appeal, Marlon challenges the district court's property division and the court's awards of alimony and attorney fees to Deborah K. Kunnemann. For the reasons set forth in our opinion below, we affirm the district court's decree.

## I. FACTUAL BACKGROUND

At the time of trial, Marlon was 52 years old and Deborah was 51. They met while attending junior college in Sterling, Colorado. Each graduated from junior college: Marlon with an associate's degree of applied science in production agriculture and Deborah with an associate's degree in business. After his graduation, Marlon moved to Imperial, Nebraska, to work on his family's farm operation. Deborah remained in Sterling to complete her degree and then joined Marlon in Imperial following her graduation. Deborah initially worked at an insurance agency, and Marlon eventually began his own farming operation. They were married on August 1, 1981, in Brighton, Colorado. Deborah wanted to continue her education after receiving her associate's degree, and Marlon supported that desire, but the family's finances

- 1 -

never allowed that to happen. Three children were born of the marriage, all of whom had reached the age of majority at the time of the divorce proceedings.

For the majority of their marriage, Marlon and Deborah rented a home that was owned by Marlon's parents. In approximately the spring of 2000, Deborah received a $20,000 gift from her mother and used these funds to finish the home's basement. Deborah's mother also gifted a sectional couch and some tables to furnish the basement. Deborah claimed these gifts as nonmarital property. Deborah testified that she applied the $20,000 to finish the basement based upon Marlon's representations that he and Deborah would eventually receive ownership of the home from his parents. Her mother also testified that she made the gift based on Marlon's direct representations to her that he and Deborah would one day own the home. Marlon disagreed that these gifts were solely given to Deborah. He claimed that he had a strong relationship with Deborah's mother and that the money and furniture were gifts to the entire family. Marlon also testified that the home was still owned by his parents.

Deborah worked outside the home until the couple's first child was born in 1983. Two more children were born in the next 5 years. Deborah remained a stay-at-home parent until all of the children began to attend school. During this time, Deborah took care of the children and the home. Her duties included transporting the children to their various activities, maintaining the family garden, cooking meals, doing laundry, and cleaning the home. She also completed occasional projects, such as fencing and painting the barn, to assist Marlon with his farming operation.

When their youngest child reached school age, Deborah returned to work outside the home. Deborah held positions at a local bank, the children's school as a teacher's aide, the family's church as a secretary, and a dental office. All of these positions were on a part-time basis. Since the parties' separation in 2009, Deborah returned to Colorado and has held part-time positions at a hospital, bank, and physical therapy office. At the time of trial, she was earning $13 per hour at the physical therapy office and working approximately 24 to 28 hours per week. Deborah testified that she was looking for a full-time position and had submitted "over 100 plus" applications in the Denver, Colorado, area, but had not obtained any full-time position. She also testified that she researched going back to school to become a medical assistant and obtain a medical encoding degree. Deborah needed some minor surgery at the time of trial because of skin cancer and had a few other health concerns, including a thyroid condition and an enlarged heart.

Marlon farmed throughout the couple's marriage. However, his personal farming operation experienced significant financial difficulties in 2002. In fact, the financial situation deteriorated to the point where there was not enough margin to adequately secure the operation's lending needs and the bank would not loan Marlon additional funds unless further collateral was pledged. In order to continue farming, Marlon formed a partnership with his brother Myron Kunnemann. This partnership, known as M Kunnemann Brothers, combined the assets from Marlon's and Myron's personal farming operations. Marlon and Myron were the only partners in the partnership, and they never created a written partnership agreement.

When the partnership was formed in February 2002, Myron contributed significantly more financially than did Marlon. The balance sheets from each farming operation prior to the partnership formation were entered into evidence at trial. These balance sheets, which were

prepared by Adams Bank & Trust, showed that Myron contributed $471,066 in equity to the partnership while Marlon added $80,526. After subtracting the value of personal property from their initial contributions, Myron's net equity totaled $463,866 and Marlon's net equity was $30,650. The value of the real estate contributed to the partnership was $312,000 by Myron and $48,000 by Marlon. John Paisley, the southern regional president of Adams Bank & Trust, testified that he had been involved with Marlon's and Myron's banking and lending for 20 years. Paisley created the initial balance sheet for the partnership. This balance sheet shows real estate valued at $360,000 and a total net equity in the partnership of $556,415. Paisley confirmed the amount of each partner's initial contribution to the partnership.

At trial, Marlon and Myron asserted that their respective interests in the partnership were determined by the amount of their initial contributions. Based on these original contributions, Marlon testified that he had a 13-percent interest in the partnership and that Myron's interest was 87 percent. Marlon also testified that Myron would not have agreed to form a partnership if he would have known that his interest would be equal to Marlon's interest despite the substantial contribution discrepancy. Myron's testimony mirrored Marlon's; he would not have entered into a partnership with Marlon unless the return on his investment was equal to the amount of initial contribution. Marlon and Myron also believed that a written partnership agreement was not necessary because they were brothers.

Numerous financial records and tax documents from M Kunnemann Brothers were received into evidence at trial. The partnership was considered a general partnership, and the income was passed through to the partners, who each reported the income tax liability on their individual tax returns. The partnership would in turn reimburse the partners for the tax liability paid by them. The various tax documents showed that Marlon and Myron shared equally in profits, losses, and depreciation. Marlon and Myron also reported to the U.S. Department of Agriculture that they were equal partners for purposes of various farm programs. They both testified that they made the equal partner disclosures based on advice they received from the various entities they dealt with. Paisley testified that he listed them as equal partners on the partnership balance sheets for convenience of banking purposes. Paisley indicated that because he was lending to the entire partnership and also had personal guarantees from each partner, the exact percentage split did not matter for lending purposes. Additionally, the partnership's tax preparer testified that she allocated depreciation equally between the partners for ease in tax preparation.

During the course of the partnership, additional real estate was purchased. In 2007 and 2008, real estate with a total value of $505,000 was added to the partnership assets. Additional long-term debt was added for these purchases. The partnership assets varied each year as cattle and machinery were bought and sold. The amount of short-term debt fluctuated each year as well.

Deborah hired an expert to determine the value of M Kunnemann Brothers and Marlon's specific interest in the partnership. Her expert, Steven Groeteke, reviewed the historical and prospective financial information of the partnership and determined that its value was $2,283,100 as of January 1, 2010, the date closest to the parties' separation. After adjusting for the partners' disproportionate initial contributions, Groeteke concluded that Marlon's share was valued at $946,280. Marlon disagreed with Groeteke's valuation, but did not retain his own expert to

provide a competing valuation. Additional details of the valuation of the partnership will be discussed in the analysis section below.

## II. PROCEDURAL HISTORY

In October 2009, the parties separated and Deborah filed a complaint for dissolution of marriage. On September 1, 2010, the district court entered an order awarding Deborah $500 per month in temporary spousal support and $350 in temporary attorney fees.

Trial was held on November 14 and 15, 2012. The majority of the evidence at trial focused on two issues: (1) the valuation of Marlon's share of the farming partnership he had formed with his brother Myron and (2) whether the $20,000 monetary gift from Deborah's mother in 2000 was nonmarital property. Deborah also maintained her requests for alimony and attorney fees. Marlon opposed those requests.

On January 22, 2013, the district court entered a decree of dissolution dissolving the parties' marriage. The court valued the M Kunnemann Brothers partnership at $2,283,100 as of January 1, 2010, and found that Marlon had a 50-percent interest in the partnership. After accounting for Myron's larger initial contribution, the court valued Marlon's interest at $946,280. From the record, it is apparent the district court adopted Deborah's expert's valuation although there is no specific finding in the decree. The court also determined that Deborah should receive a credit for the $20,000 gift from her mother that was used to finance the finishing of the basement in the family home and that the gifted furniture was Deborah's nonmarital property.

The court ordered Marlon to pay alimony of $500 per month for a total of 180 months and $5,000 of Deborah's attorney fees. The decree also divided Deborah and Marlon's property and marital debts. After the division, Marlon was ordered to make an equalization payment to Deborah in the amount of $450,000, payable over the course of nine annual payments of $50,000 each with interest at the judgment rate. After his motion for new trial was overruled, Marlon filed the instant appeal.

## III. ASSIGNMENTS OF ERROR

Marlon alleges, restated, that the trial court erred when it (1) classified, valued, and divided the marital estate; (2) awarded alimony to Deborah; (3) ordered him to pay a portion of Deborah's attorney fees; and (4) denied his motion for a new trial.

We also note that Deborah makes various suggestions in the argument section of her brief for revisions to the decree of dissolution. Specifically, Deborah suggests that the partnership should have been valued as of January 1, 2012, and she argues that the alimony and attorney fee awards should have been greater. However, there is no designated cross-appeal in her brief and no assignments of error made. Because Deborah has not properly cross-appealed, we will not address her suggestions for revisions to the decree. See *In re Interest of Natasha H. & Sierra H.*, 258 Neb. 131, 602 N.W.2d 439 (1999) (appellate court will not consider assignments of error in appellee's brief that does not designate cross-appeal).

## IV. STANDARD OF REVIEW

In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion. *Mamot v. Mamot*, 283 Neb. 659, 813 N.W.2d 440 (2012).

An appellate court reviews a judge's ruling on a motion for new trial for an abuse of discretion. *State ex rel. Keegan M. v. Joshua M.*, 20 Neb. App. 411, 824 N.W.2d 383 (2012).

A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Fitzgerald v. Fitzgerald*, 286 Neb. 96, 835 N.W.2d 44 (2013).

## V. ANALYSIS

### 1. PROPERTY DIVISION

Marlon argues that the district court did not properly divide the parties' assets. He focuses his argument on two specific items in the award: his interest in the M Kunnemann Brothers partnership and the $20,000 gift from Deborah's mother that was used to finish the basement in the home the parties rented from Marlon's parents.

Under Neb. Rev. Stat. § 42-365 (Reissue 2008), the equitable division of property is a three-step process. The first step is to classify the parties' property as marital or nonmarital. The second step is to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *Sitz v. Sitz*, 275 Neb. 832, 749 N.W.2d 470 (2008); *Pohlmann v. Pohlmann*, 20 Neb. App. 290, 824 N.W.2d 63 (2012).

Although the division of property is not subject to a precise mathematical formula, the general rule is to award a spouse one-third to one-half of the marital estate, the polestar being fairness and reasonableness determined by the facts of each case. *Millatmal v. Millatmal*, 272 Neb. 452, 723 N.W.2d 79 (2006); *Pohlmann v. Pohlmann, supra*.

With the above principles in mind, we will separately address each of Marlon's contentions related to division of the marital estate.

### (a) M Kunnemann Brothers Partnership

At trial, Deborah utilized an expert witness who purported to give the fair value of Marlon's interest in the M Kunnemann Brothers partnership as of January 1, 2010. Deborah's expert, Groeteke, is a certified public accountant who works as a tax manager and provides business valuation services in litigation. Groeteke is certified as a valuation analyst by the National Association of Certified Valuation Analysts. He has been engaged in valuing small family corporations, partnerships, and businesses as a certified analyst since 1996. Groeteke testified at trial, and his valuation report was received in evidence.

In preparing his valuation of M Kunnemann Brothers, Groeteke determined that he would apply a fair value standard of valuation. The fair value standard is defined as the amount that would fairly compensate an owner who was involuntarily deprived of the benefits of an asset

where there is neither a willing buyer nor a willing seller. Groeteke also determined that he would apply the premise value of a going concern in existence; meaning that he assumed the partnership was going to continue in existence after the date of valuation. Groeteke testified that the valuation he conducted was prepared in accordance with the standards and principles generally employed and utilized in his industry.

Groeteke valued the M Kunnemann Brothers partnership at $2,283,100 as of January 1, 2010. To arrive at this figure, Groeteke used the adjusted net assets method of valuation. Under this method, the analyst adjusts the book value of the assets to fair market value and then reduces the total adjusted value of assets by the fair market value of liabilities. Groeteke analyzed the partnership's balance sheet from March 8, 2010--the balance sheet prepared closest in time to the valuation date of January 1--and determined the total partners' equity, or book value, was $1,977,408. Then, he analyzed the values of the partnership assets to determine whether any needed to be adjusted in order to bring the values to fair value.

Three adjustments were made to the value of the partnership assets. First, Groeteke made a $28,302 adjustment to the partnership's crop inventory. Using a market value provided by Frenchman Valley Coop, Groeteke determined that the crop inventory of corn was valued at $386,683, but was only reported on the partnership's balance sheet as $358,382. Next, Groeteke made an adjustment of $65,750 to the raised breeding stock. Values obtained from the Imperial Auction Market Reports revealed that the market value of the partnership's breeding stock was $290,900, but only reported as $225,150. Finally, Groeteke determined that the real estate value on the partnership balance sheet necessitated adjustment because the balance sheet contained tax assessment values which did not reflect the full value of the land. Groeteke discovered that the county assessor lists parcels at 70 percent of their value. Applying this adjustment, Groeteke determined that the real estate on the balance sheet required an increase of $211,599. The aggregate of Groeteke's adjustments totaled $305,650.

After Groeteke added his adjustments to the partnership's book value from the balance sheet ($1,977,408), he arrived at a total net value of $2,283,058, which he rounded to $2,283,100. However, before reaching a final conclusion as to the partnership's value, he considered whether any discounts should have been applied. Specifically, Groeteke evaluated the marketability and minority interest discounts. Marketability is defined as the ability to readily sell an ownership interest in a timely manner. Normally, a marketability discount is applied when valuing a closely held company, but Groeteke determined that such a discount is not appropriate in a divorce-related valuation. He reasoned that a spouse should not be required to accept a reduction for the contemplation of a transaction that is unforeseen at the date of valuation. A minority interest discount recognizes the reduced value that results from a shareholder's inability to control the business. Groeteke also determined this discount was not applicable in the present case because no sale of the partnership was contemplated and the result of applying the discount would have dramatically distorted the resulting value to the "marital community." Thus, Groeteke concluded M Kunnemann Brothers was properly valued at $2,283,100.

Groeteke determined that Marlon owned a 50-percent interest in the partnership based upon the various financial, tax, and government documents provided to him. To arrive at the value of Marlon's share in the partnership, Groeteke made one final adjustment. As noted above, Myron contributed significantly more than Marlon when the partnership was formed. Taking the

value of the assets of each partner's separate operation prior to the partnership formation, Groeteke determined the difference in the partners' initial contributions was $390,540. Groeteke divided the total value of the partnership into two equal shares and then reduced Marlon's share by $195,270, or one-half of the difference in the partners' initial contributions. Myron's share was increased by $195,270. Therefore, Groeteke determined the following values for Marlon's and Myron's interests in the partnership:

**Marlon's Equity Interest**

| | |
|---|---|
| Total Value | $2,283,100 |
| Marlon's ownership interest | 50% |
| Value of 50-percent equity interest | $1,141,550 |
| Adjustment for beginning capital in 2002 | ($ 195,270) |
| Marlon Kunnemann's 50-percent interest | $ 946,280 |

**Myron's Equity Interest**

| | |
|---|---|
| Total Value | $2,283,100 |
| Marlon's ownership interest | 50% |
| Value of 50-percent equity interest | $1,141,550 |
| Adjustment for beginning capital in 2002 | $ 195,270 |
| Myron Kunnemann's 50-percent interest | $1,336,820 |

Marlon argues that the district court erred when it accepted Groeteke's valuation of his interest in the partnership. First, he argues that he did not have a 50-percent interest in the partnership. He asserts that his interest was only 13 percent based upon the amount of his initial contribution. Next, he contends that Groeteke made erroneous adjustments to the value of the partnership assets. Finally, he asserts that marketability and minority interest discounts should have been applied to his interest in the partnership.

In our de novo review of the record, we cannot say that the district court abused its discretion in determining that Marlon owned a 50-percent interest in the partnership. The partnership's financial documents, the various tax documents and returns, and the disclosures to the U.S. Department of Agriculture all demonstrated that each partner had an equal share in the partnership. These documents were signed by Marlon under oath, indicating that the information on them was true and accurate. The partners equally shared in the partnership profits and losses, income, expenses, and depreciation. While Marlon and Myron claimed that their oral partnership agreement made each partner's ownership share dependent on the partner's initial contribution, the manner in which they operated the partnership supports the district court's finding. We also note that the net book value of the partnership increased from $556,415 in 2002 to $1,977,408 as of March 8, 2010, and that a substantial portion of this increase resulted from the partnership's purchase of real estate. And, the record reflects that the value of the real estate increased significantly from the time of its purchase until 2010. The district court did not abuse its discretion in finding that, for purposes of the calculation of the marital estate, Marlon has a 50-percent interest in the partnership.

Next, Marlon challenges Groeteke's adjustments to the value of certain assets of the partnership. Marlon claims that Groeteke assigned erroneous commodity values without accounting for the differences in the dates used and the nature of the assets. Marlon essentially

argues that no adjustments to the book value of the commodities should have been made. However, Marlon did not offer any expert evidence to rebut Groeteke's valuation methodology or to support a different valuation methodology.

Finally, Marlon claims that a 35-percent discount should have been applied to the value of his interest in order to account for marketability and minority interest issues. He cites to this court's decision in *Shuck v. Shuck*, 18 Neb. App. 867, 806 N.W.2d 580 (2011), to support his contention that the district court should have applied marketability and minority interest discounts in this case. In *Shuck*, we confronted a situation in which four family business entities were valued during dissolution proceedings. Neither party to the dissolution proceedings was the majority interest holder in any of the entities. To value these entities, the court appointed a property evaluator. The evaluator appraised the businesses and testified that marketability and minority interest discounts should be applied. Based on the facts of that case, we determined that the trial court did not abuse its discretion when it adopted those discounts.

The present case, however, is distinguishable from *Shuck*. Although Marlon claimed a 35-percent discount should have been applied because of marketability and minority interest concerns, he did not explain how he arrived at his discount figure or offer evidence either to rebut Groeteke's decision not to apply those discounts or to support application of any discounts. Therefore, based on the facts of this case, we cannot conclude the district court abused its discretion when it did not apply these discounts.

When we review Groeteke's valuation of the partnership, we find that it was reasonable, based in fact, and took into consideration the particular circumstances of this case. See *Gary's Implement v. Bridgeport Tractor Parts*, 281 Neb. 281, 799 N.W.2d 249 (2011) (expert's opinion must have sound and reasonable basis such that expert is able to express reasonably accurate conclusion as distinguished from mere guess or conjecture). Therefore, based on the record before us, we conclude that the district court did not abuse its discretion when valuing Marlon's interest in the partnership.

### (b) $20,000/Furniture Gifts
### From Deborah's Mother

As detailed in the factual background above, Deborah received a $20,000 gift from her mother in 2000, together with a sectional couch and tables. The trial court awarded Deborah the furniture as nonmarital property and gave Deborah a credit in the division of the marital estate of $20,000 for the monetary gift. Deborah testified that she used the monetary gift to finish the basement in the family home after having relied on Marlon's representations that they would one day own the home. Deborah's mother testified that Marlon made similar representations to her throughout the marriage. Deborah's mother stated that the money was a gift to her daughter, but she realized that it would likely go to the benefit of the entire family. No further documentary evidence of the gift was adduced at trial. At the time of these proceedings, Marlon continued to rent the home from his parents. Deborah also testified that the sectional couch and tables were a gift from her mother to her.

Marlon asserts that it was error to set off the $20,000 to Deborah as a credit against her portion of the marital estate because there is no marital property to set if off against, since his

parents continue to own the home. Alternatively, Marlon argues that it was a gift to the entire family.

When awarding property in a dissolution of marriage, property acquired by one of the parties through gift or inheritance ordinarily is set off to the individual receiving the gift or inheritance and is not considered a part of the marital estate. *Bussell v. Bussell*, 21 Neb. App. 280, 837 N.W.2d 840 (2013). The burden of proof to show that property is nonmarital remains with the person making the claim. *Plog v. Plog*, 20 Neb. App. 383, 824 N.W.2d 749 (2012). In this case, Deborah claimed the gift was nonmarital property.

Given the conflicting testimony regarding this gift, we give weight to the fact that the district court heard and observed the witnesses and accepted Deborah's version of the events concerning the gifts instead of Marlon's. See *Millatmal v. Millatmal*, 272 Neb. 452, 723 N.W.2d 79 (2006); *Keig v. Keig*, 20 Neb. App. 362, 826 N.W.2d 879 (2012). We conclude the district court did not abuse its discretion when it awarded Deborah a credit for the $20,000 monetary gift and awarded her the furniture in question as nonmarital property. This assigned error is without merit.

### 2. ALIMONY

Marlon also contends that the district court erred when it awarded Deborah alimony in the amount of $500 per month for 180 months. He asserts that this is not a proper case for alimony because of the nature of his occupation, the large equalization payment awarded to Deborah, and the fact that he has assumed a large portion of the marital debts.

A court should consider the factors set forth in § 42-365 when awarding alimony. The relevant part of this section provides:

> When dissolution of a marriage is decreed, the court may order payment of such alimony by one party to the other and division of property as may be reasonable, having regard for the circumstances of the parties, duration of the marriage, a history of the contributions to the marriage by each party, including contributions to the care and education of the children, and interruption of personal careers or education opportunities, and the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party.

In addition to the statutory criteria listed above, in considering alimony upon a dissolution of marriage, a trial court is to consider the income and earning capacity of each party, as well as the general equities of each situation. See *Becker v. Becker*, 20 Neb. App. 922, 834 N.W.2d 620 (2013).

In determining whether alimony should be awarded, in what amount, and over what period of time, the ultimate criterion is one of reasonableness. *Sitz v. Sitz*, 275 Neb. 832, 749 N.W.2d 470 (2008). The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. *Becker v. Becker, supra*. Disparity in income or potential income may partially justify an award of alimony. *Id*. Alimony should not be used to equalize the incomes of the parties or to punish one of the parties. *Patton v. Patton*, 20 Neb. App. 51, 818 N.W.2d 624 (2012). In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same

amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. *Sitz v. Sitz, supra.*

In this case, we conclude the district court's award of alimony was not an abuse of discretion. The record shows that the parties had been married for approximately 29 years at the time they separated. During the marriage, Marlon was able to farm while Deborah gave up further education and employment to tend to the children and the home. Deborah returned to work when the children reached school age, but has never earned more than $13 per hour and has not worked full time for a number of years. The district court calculated the parties' average annual income as $14,155 for Deborah and $32,500 for Marlon. Marlon has retained all of the income-producing assets of the marriage and also receives various benefits from the partnership such as a vehicle and gasoline. He also continues to reside in the home owned by his parents, paying only $200 per month in rent. Our review of the record in this case in light of the factors involved in an alimony award leads us to conclude that the district court did not abuse its discretion when it awarded Deborah alimony in the amount of $500 per month for 180 months.

Marlon's assertion that the alimony award is unreasonable because of the dangerous and physically demanding nature of his job is not persuasive. Marlon's argument that he may not be able to continue to generate the same level of income in the future amounts to speculation. No evidence was presented at trial to demonstrate that Marlon had any immediate plans to stop farming.

### 3. ATTORNEY FEES

Marlon asserts the district court erred in awarding Deborah $5,000 in attorney fees. He contends that such an award was unreasonable because Deborah would have sufficient funds to pay her fees as a result of the equalization payment and alimony and from her own earnings. He also notes that he must pay for his own attorney fees in the amount of $14,000. In a marital dissolution action, an award of attorney fees depends on a variety of factors, including the amount of property and alimony awarded, the earning capacity of the parties, and the general equities of the situation. *Molczyk v. Molczyk*, 285 Neb. 96, 825 N.W.2d 435 (2013).

In awarding Deborah $5,000 in attorney fees, the district court noted that Deborah had requested $26,000 to cover her attorney fees, expert witness fees, and expenses. The court also declared that Marlon's obligation to pay this portion of Deborah's fees was part of his overall support obligation and that his alimony obligation would have been greater if attorney fees were not awarded.

We have reviewed the record and conclude that the district court did not abuse its discretion when it awarded Deborah $5,000 in attorney fees. This assigned error is without merit.

### 4. MOTION FOR NEW TRIAL

Finally, Marlon argues that the district court erred when it denied his motion for a new trial based upon the arguments in earlier sections of his brief. Because we have already rejected those arguments, we also conclude that the district court did not abuse its discretion when it denied Marlon's motion for a new trial.

## VI. CONCLUSION

The district court did not abuse its discretion when it divided the marital estate, awarded Deborah alimony, and ordered Marlon to pay a portion of Deborah's attorney fees and costs.

AFFIRMED.