Christian A. Barth, appellee and cross-appellant, v.
Mindi J. Barth, now known as Mindi J. Boettcher,
appellant and cross-appellee.

___ N.W.2d ___

Filed August 5, 2014.    No. A-13-709.

1. **Divorce: Judgments: Jurisdiction: Appeal and Error.** The standard of review in an appeal concerning a jurisdictional issue in an action for dissolution of marriage is the same standard for appellate review of any other judgment in a dissolution action. Regarding a question of law, an appellate court has an obligation to reach a conclusion independent from a trial court's conclusion in a judgment under review.

2. **Divorce: Venue.** An action for dissolution of marriage shall be brought in the district court of the county in which one of the parties resides.

3. **Courts: Jurisdiction.** When the jurisdiction of the county court and district court is concurrent, the basic principles of judicial administration require that the court which first acquires jurisdiction should retain it to the exclusion of the other court.

4. ____: ____. Courts enforce the jurisdictional priority doctrine to promote judicial comity and avoid the confusion and delay of justice that would result if courts issued conflicting decisions in the same controversy.

5. **Divorce: Child Custody: Child Support: Property Division: Alimony: Attorney Fees: Appeal and Error.** In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion.

6. **Judges: Words and Phrases.** A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

7. **Divorce: Child Custody.** When custody of a minor child is an issue in a proceeding to dissolve the marriage of the child's parents, child custody is determined by parental fitness and the child's best interests.

8. **Child Custody.** When both parents are found to be fit, the inquiry for the court is the best interests of the children.

9. **Divorce: Child Custody.** In determining a child's best interests under Neb. Rev. Stat. § 42-364 (Cum. Supp. 2012), courts may consider factors such as general considerations of moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and the parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; parental capacity to provide physical care and satisfy educational needs of the child; and many other factors relevant to the general health, welfare, and well-being of the child.

10. **Evidence: Appeal and Error.** Where credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.

11. **Child Custody: Appeal and Error.** In contested custody cases, where material issues of fact are in great dispute, the standard of review and the amount of deference granted to the trial judge, who heard and observed the witnesses testify, are often dispositive of whether the trial court's determination is affirmed or reversed on appeal.

12. **Child Custody: Visitation: Stipulations.** It is the responsibility of the trial court to determine questions of custody and visitation of minor children according to their best interests. This is an independent responsibility and cannot be controlled by the agreement or stipulation of the parties themselves or by third parties.

13. **Divorce: Costs.** Neb. Rev. Stat. § 42-367 (Reissue 2008) permits a court to direct costs against either party in an action for dissolution of marriage.

14. **Divorce: Expert Witnesses: Fees: Appeal and Error.** In a dissolution action, an appellate court reviews an award of expert witness fees de novo on the record to determine whether there has been an abuse of discretion by the trial judge.

15. **Divorce: Child Support: Appeal and Error.** In dissolution of marriage actions, the trial court's determination of child support is reviewed for an abuse of discretion.

16. **Child Support: Rules of the Supreme Court: Presumptions.** The Nebraska Child Support Guidelines are to be applied as a rebuttable presumption to both temporary and permanent support, and any deviation from the guidelines must take into consideration the best interests of the children.

17. ____: ____: ____. A court may deviate from the Nebraska Child Support Guidelines when one or both of the parties have provided sufficient evidence to rebut the presumption.

18. **Child Support: Rules of the Supreme Court.** The Nebraska Child Support Guidelines provide that a deviation is permissible whenever the application of the guidelines in an individual case would be unjust or inappropriate.

19. ____: ____. The Nebraska Child Support Guidelines allow for a deduction in determining monthly net income for biological or adopted children for whom the obligor provides regular support.

Appeal from the District Court for Lincoln County: Donald E. Rowlands, Judge. Affirmed as modified.

Stephanie Flynn, of Stephanie Flynn Law Office, P.C., L.L.O., for appellant.

Shane M. Cochran, of Snyder, Hilliard & Bishop, L.L.O., for appellee.

Irwin, Riedmann, and Bishop, Judges.

Riedmann, Judge.

## INTRODUCTION

Mindi J. Barth, now known as Mindi J. Boettcher, appeals and Christian A. Barth cross-appeals from the order of the district court for Lincoln County which dissolved their marriage. On appeal, Mindi argues that the district court erred in finding that it had jurisdiction over the action, granting Christian custody of the parties' minor child, placing restrictions on cohabitation, and ordering her to pay a portion of an expert witness fee. We find no error in the district court's findings as to jurisdiction, custody, or the expert witness fee. However, the restriction on cohabitation was an impermissible delegation of the court's duty, and we therefore strike that provision from the parenting plan.

On cross-appeal, Christian argues that the district court erred in deviating from the Nebraska Child Support Guidelines without good cause. We agree and modify that portion of the decree as explained below.

## BACKGROUND

Christian and Mindi were married in August 2010. Their son, Graham Barth, was born in January 2011. Mindi also has a daughter, Berkley Nielsen, from a previous relationship.

Christian, Mindi, Graham, and Berkley lived in Lincoln, Lancaster County, Nebraska, until January 2012, when they moved to North Platte, Lincoln County, Nebraska. On April 26, Mindi filed a complaint for dissolution of marriage in the district court for Lancaster County. On May 1, Christian filed a complaint for dissolution of marriage in the district court for Lincoln County. Mindi moved to dismiss Christian's action because she filed her complaint first. After a hearing on the motion and consultation with the Lancaster County District Court judge, the Lincoln County District Court determined that the Lancaster County action would be dismissed and the Lincoln County action would proceed. Accordingly, Mindi's motion to dismiss in Lincoln County was denied.

Trial on the issues of property division, custody, and child support was held on June 13 and July 16, 2013. At the time of trial, Christian was working as a firefighter-paramedic for

the North Platte Fire Department. He works 24-hour shifts every other day for 9 days and then has 6 consecutive days off. So in an average month, Christian works 10 days of 24-hour shifts and has the other 20 days off. When Christian is working, Graham goes to a 24-hour licensed daycare. The daycare provider cares for Graham in her home and lives on a hobby farm with ducks, chickens, turkeys, dogs, cats, cows, a sheep, and a llama. Graham has his own bed at the daycare provider's home and his own drawer there for his clothing. The daycare provider testified Graham is always clean, well groomed, and dressed appropriately. Graham gets along well with the other children and is very good to the animals. According to the daycare provider, Christian and Graham are always happy to see each other when Christian comes to pick up Graham.

Christian's neighbor testified that her children have play dates with Graham and that she would "[a]bsolutely" feel comfortable allowing Christian to watch her children. She said that Graham is happy and well behaved and that it appears that Christian and Graham have a very healthy relationship with positive interactions and good boundaries.

Dr. Rebecca Schroeder, a clinical psychologist whom Christian requested to perform a parental fitness evaluation on him, found that Christian and Graham have a very good relationship and a strong bond, they interact very naturally together, there is open affection between them, and Christian displays appropriate parenting techniques and a loving regard for Graham. Dr. Schroeder cautioned that she had never met Mindi and therefore could not give an opinion as to what was in Graham's best interests. However, she believed that Christian had all of the skills necessary to be a good, effective parent for Graham.

At the time of trial, Mindi was working full time at a plasma center in Lincoln. Although her schedule varies somewhat, she generally worked Monday through Friday from 9 a.m. to 5 p.m. or 10 a.m. to 7 p.m. Graham goes to daycare when Mindi is working. Mindi's best friend testified that she has been friends with Mindi for 7 or 8 years and that her children are the same ages as Mindi's. She said Mindi is a great mother who loves her children. Mindi's best friend allows Mindi to

watch her children and said that she has never had any con-
cerns about Mindi's ability to parent.

There was extensive evidence presented at trial regarding
Mindi's alcohol use. Christian testified that Mindi's alcohol
issues began causing problems in their marriage almost imme-
diately. It appeared to Christian that Mindi tried to hide her
drinking because he would find bottles of alcohol in laundry
baskets, under clothes, under the bathroom sink, and tucked
away in closets. He said it seemed that once Mindi started
drinking, she could not stop; if she had one drink, then
she would have more, and her drinking increased in amount
and frequency the longer they were together. According to
Christian, at one point, Mindi told him that she was drinking
every day, even when he was at work and she was home alone
with Graham and Berkley.

In addition to the amount and frequency of Mindi's drinking,
Christian was concerned that Mindi was also taking a number
of medications and having adverse reactions to the combina-
tion of alcohol and medication. According to Christian, mix-
ing alcohol and medication caused Mindi to cry a lot; become
very aggressive, hostile, and angry; and "flip out." Christian
recounted several incidents that he claimed occurred as a result
of Mindi's drinking.

He described an incident in August 2011 when Mindi became
intoxicated while they were out with friends and she threw a
beer bottle at another woman. After Christian escorted Mindi
outside, she became very upset and starting crying and fighting
with him. At one point, she sat on the ground and banged her
head on a bicycle rack.

Five days later, Christian and Mindi were celebrating their
first anniversary at home and each consumed three beers.
Mindi's behavior then became extremely erratic. She started
sobbing uncontrollably, thrashing around, and throwing her-
self into the wall. She knocked herself out momentarily, and
after regaining consciousness, she had a blank stare on her
face. Then, according to Christian, Mindi said that her name
was "Joe" and that she was 75 years old. She got very aggres-
sive, to the point that Christian had to physically restrain her
from hitting him or hurting herself. She sat on some stairs,

rocking back and forth and continually hitting her head on the wall and the bannister.

Eventually, Mindi was taken to a hospital that night and admitted to inpatient psychiatric services overnight. While at the hospital, Mindi underwent a psychosocial assessment. She reported having hallucinations of a man named "Joe" and said that she had been struggling with anxiety, panic attacks, and depression since Graham's birth. She said that she had been working with her physician and was taking medication to help her cope. Ultimately, the hospital staff psychiatrist diagnosed Mindi with major depressive disorder, recurrent, moderate intensity with postpartum onset; anxiety disorder; and alcohol abuse. Mindi was referred to outpatient counseling and asked to follow up with her physician to continue with her medications.

One night, a week after Mindi's hospitalization, she woke up around 10 p.m. and turned into "Joe" again. She knocked pictures off the walls, acted very aggressively, and sat on the ground rocking back and forth. Christian called his mother and Mindi's mother to come over, and eventually, Christian's mother convinced Mindi to take her medication. Later that month, following an argument with Christian, Mindi went home and ingested a large amount of pain medication. When Christian arrived home, he found Mindi lying in bed and discovered an "empty" bottle of the medication. Mindi admitted that she had taken the remaining pills, and when Christian forced Mindi to vomit, he counted 12 or 15 pills in the sink.

In September and October 2011, Mindi attended five sessions with Cynthia Hollister, a licensed mental health therapist. Mindi reported to Hollister that she had been drinking alcohol since she was 15 years old and that her consumption had gradually increased over the years. Mindi said that she often drank during the day and had to hide it because of Christian's "hypervigilance" about her drinking. Mindi reported that her father and two of her sisters have issues with alcoholism, which indicated to Hollister that Mindi has a genetic predisposition to alcoholism or substance abuse. At one point during treatment, Mindi told Hollister that she considered herself to be an alcoholic. Hollister diagnosed

Mindi with anxiety disorder, depressive disorder, and alcohol dependence.

At the time Mindi began seeing Hollister, she had recently begun attending Alcoholics Anonymous (AA) meetings and obtained a sponsor. Mindi earned her "30 day [sobriety] chip" from AA during that time, but she had mixed feelings about the achievement, reporting that she felt resentful instead of happy because she could not go out and drink like other people are able to do. Mindi's last session with Hollister was on October 13, 2011. Mindi simply stopped attending counseling and AA and began drinking again.

Several more incidents occurred thereafter. In early January 2012, Christian was home one afternoon with Graham while Mindi and Berkley were out running errands. Christian was taking out the trash when he observed Mindi throw some empty "mini-shooters," which are small bottles of alcohol, in a Dumpster before pulling her car into the garage at their home. Later that month, Mindi and Berkley spent the night at Mindi's best friend's house for Mindi's birthday. The following day, Mindi was supposed to help Christian clean their apartment before they moved to North Platte, but she did not return home until around 4 p.m. Christian thought Mindi had been drinking, because of her behavior. They argued but reconciled, and Mindi apologized and said she would find counseling for herself in North Platte and begin attending AA again. However, she never did so.

Mindi began working at a medical center in North Platte in February 2012. She went out drinking with some of her coworkers after her first day of work. When she got home, it was obvious to Christian that she was intoxicated, because she stumbled through the door and went straight to the bathroom, where she vomited. After doing so, Mindi tried to play with Berkley, but she ended up passing out in Berkley's lap. When Christian tried to get Mindi to go to bed, she got angry and kicked Christian in the stomach, hit him in the testicles, and swung at him a third time before Christian pushed her away. This incident occurred in front of Berkley. Christian put Berkley to bed, and after he finally got Mindi to bed, she vomited on the floor next to the bed.

At trial, Mindi blamed the August 2011 incident resulting in her hospitalization on an adverse reaction to mixing her medications with alcohol. She said that her mental health issues were the result of postpartum depression and that she has not had any similar incidents since then. Mindi claimed that many of the other incidents Christian described were the result of postpartum depression and anxiety and that they were not all related to alcohol. Mindi denied getting intoxicated with her coworkers in North Platte. However, she was impeached with the statements she made during her deposition admitting that she had been intoxicated that night and that she did not remember going home.

At the time of trial, Mindi was in a relationship. The relationship began around August 2012, and Mindi's boyfriend moved into her residence in November or December 2012. Mindi claimed at trial that he moved out of her home in May 2013. However, evidence was presented that his vehicle was seen pulling out of Mindi's garage around 6 a.m. on June 21 and into the garage around 7:45 that evening.

Mindi's boyfriend's criminal history includes an arrest for possession of marijuana and "ecstasy" and three convictions for driving under the influence. Mindi and her boyfriend admitted they had consumed alcohol together despite the fact that neither of them was permitted to do so. Mindi's boyfriend was on probation at the time, which prohibited him from drinking alcohol. Mindi was forbidden from drinking alcohol by a temporary order entered in this case in June 2012. When asked what positive results could come from consuming alcohol, Mindi responded, "I do not believe that I have a problem, and I do believe I am able to handle myself and have an adult beverage if Graham is not there."

On July 19, 2013, the court entered an order dissolving Christian and Mindi's marriage. The court found that Christian and Mindi are both fit and proper people to have custody of Graham but that the best interests of Graham would be served by placing his legal and physical custody with Christian, subject to reasonable parenting time with Mindi. The court noted that generally, a parent with a work schedule such as

Christian's would not be in a position to be awarded custody of a child. But the court's concerns were alleviated by the testimony of Graham's daycare provider.

The court found Mindi to be a loving mother who has a close bond with Graham and would appropriately parent him. Several serious deficiencies were noted in Mindi's behavior and character, however. The court concluded that Mindi has a serious problem with alcohol, which she attempted to minimize during her testimony at trial. The court found that Mindi was not dealing with her alcohol problem and expressed concern about her minimization of the problem and the fact that she violated the court's temporary order. Mindi's credibility and her "choice of live-in-boyfriend" were also factors that the court considered in its custody determination. Ultimately, the court concluded that Mindi has many positive attributes as a loving mother. But her past mental instability and alcohol abuse, probable continuing problem with alcohol that she refuses to address, and cohabitation with someone who also has a serious alcohol problem prevented the court from awarding custody to her.

The court included a restriction on cohabitation in the parenting plan. The restriction provides that if Christian is not living with an unrelated member of the opposite sex but Mindi is doing so, Christian may refuse to allow her overnight visitation with Graham, and vice versa.

When calculating child support, the court noted that Mindi "has a child from a previous relationship, which requires this [c]ourt for good cause shown to deviate from the [child support] worksheet." As a result, the court ordered Mindi to pay $305 per month in child support. Finally, the district court divided the costs of the action, including Dr. Schroeder's fee, equally between the parties.

Mindi timely appeals, and Christian cross-appeals.

## ASSIGNMENTS OF ERROR

On appeal, Mindi assigns that the district court erred in (1) finding that the Lincoln County District Court obtained jurisdiction before the Lancaster County District Court,

(2) granting Christian custody of Graham, (3) placing restrictions on cohabitation in the parenting plan, and (4) ordering that Mindi be required to pay a portion of an expert witness fee.

On cross-appeal, Christian assigns that the district court erred in deviating from the child support guidelines without good cause.

## ANALYSIS

*Jurisdiction.*

[1] Mindi argues that the Lincoln County District Court erred in concluding that it obtained jurisdiction before the Lancaster County District Court. The standard of review in an appeal concerning a jurisdictional issue in an action for dissolution of marriage is the same standard for appellate review of any other judgment in a dissolution action. Regarding a question of law, an appellate court has an obligation to reach a conclusion independent from a trial court's conclusion in a judgment under review. *Huffman v. Huffman*, 232 Neb. 742, 441 N.W.2d 899 (1989).

[2] Under Nebraska law, an action for dissolution of marriage shall be brought in the district court of the county in which one of the parties resides. Neb. Rev. Stat. § 42-348 (Reissue 2008). Mindi filed her action for dissolution of marriage in the Lancaster County District Court on April 26, 2012. Her complaint alleged that she was a resident of Lancaster County. On May 1, 2012, Christian filed his dissolution action in the Lincoln County District Court. His complaint asserted that he resided in Lincoln County. Based on the allegations of the two complaints, the district court of either county could have exercised jurisdiction over a dissolution action between them.

[3,4] When the jurisdiction of the county court and district court is concurrent, the basic principles of judicial administration require that the court which first acquires jurisdiction should retain it to the exclusion of the other court. *Washington v. Conley*, 273 Neb. 908, 734 N.W.2d 306 (2007). In the present action, both courts are district courts, but we find no reason not to apply the basic doctrine. Thus, under the

doctrine of judicial administration, Lancaster County could have demanded jurisdictional priority. However, the principles of judicial administration require the elimination of unnecessary litigation and the promotion of judicial efficiency and economy. Courts enforce the jurisdictional priority doctrine to promote judicial comity and avoid the confusion and delay of justice that would result if courts issued conflicting decisions in the same controversy. *Molczyk v. Molczyk*, 285 Neb. 96, 825 N.W.2d 435 (2013).

The record indicates that the judges from Lancaster County and Lincoln County conferred on the matter and decided that the Lancaster County action would be dismissed. In a collaborative effort, the courts apparently decided not to enforce the jurisdictional priority doctrine, but we have no record to determine the basis of that decision. We note, however, that through this joint decision, the principles of judicial administration were met, as there was no unnecessary litigation or danger of conflicting decisions. To reverse at this point in the litigation, when jurisdiction would have been proper in either district court, would not promote judicial efficiency or economy. Therefore, we find no abuse of discretion in allowing this case to proceed in Lincoln County.

*Custody.*

[5,6] Mindi argues that the district court erred in awarding Christian custody of Graham. In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion. *Bussell v. Bussell*, 21 Neb. App. 280, 837 N.W.2d 840 (2013). A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

[7-9] When custody of a minor child is an issue in a proceeding to dissolve the marriage of the child's parents, child custody is determined by parental fitness and the child's best

interests. *Maska v. Maska*, 274 Neb. 629, 742 N.W.2d 492 (2007). When both parents are found to be fit, the inquiry for the court is the best interests of the children. *Id*. In determining a child's best interests under Neb. Rev. Stat. § 42-364 (Cum. Supp. 2012), courts may consider factors such as general considerations of moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and the parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; parental capacity to provide physical care and satisfy educational needs of the child; and many other factors relevant to the general health, welfare, and well-being of the child. *Maska v. Maska, supra*.

The district court found that Mindi is a loving mother who has a close bond with Graham and would appropriately parent him. Despite this, the court determined that awarding custody of Graham to Christian was in Graham's best interests because of concerns over Mindi's past mental instability and her alcohol issues, including the fact that Mindi attempted to minimize her alcohol problem and refused to address it.

The record indicates that Christian and Mindi both love Graham and would appropriately care for him and parent him. They both have suitable residences for him, are suitably employed in order to provide for him, and have appropriate care for him when they are working. Thus, the record supports the district court's finding that Christian and Mindi are both fit parents.

The evidence also supports the district court's concerns about Mindi's mental health history and alcohol use. Mindi was diagnosed with depression and anxiety, and drinking alcohol exacerbated her conditions, especially when mixed with her medications. She admitted to Hollister that she considered herself to be an alcoholic, that her drinking had gradually increased over the years, and that she often drank during the day but hid it from Christian. Although Mindi attended therapy and AA meetings for a brief period of time, she quickly began drinking to excess again and continued to drink alcohol

at the time of trial despite the court's prohibiting her from doing so.

Mindi argues that Christian's work schedule is concerning when he is absent from Graham's life for several days in a row. We note that Christian's work schedule does not require him to be away from Graham for several days in a row, and in an average month, Christian's schedule allows him to be with Graham for 20 full days. Although his schedule is unusual because it requires him to find 24-hour care for Graham, we do not find it to be a basis upon which to reverse the award of custody to him. The record indicates that Graham is appropriately cared for while Christian is working, that Graham enjoys being in the daycare provider's home with her family, and that Graham is growing and developing very well.

[10,11] In this case, both Christian and Mindi presented evidence concerning their own parenting strengths and the weaknesses of the other. Where credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Marcovitz v. Rogers*, 267 Neb. 456, 675 N.W.2d 132 (2004). In fact, in contested custody cases, where material issues of fact are in great dispute, the standard of review and the amount of deference granted to the trial judge, who heard and observed the witnesses testify, are often dispositive of whether the trial court's determination is affirmed or reversed on appeal. *Id*.

The record presents ample evidence to support the district court's decision to award custody to Christian, and given all of that evidence, our standard of review, and deference to the trial court's observation of the witnesses, we cannot find that the district court abused its discretion in awarding custody of Graham to Christian.

*Cohabitation*.

Mindi argues that the district court erred in placing restrictions on cohabitation in the parenting plan. We agree and conclude that the district court's order giving Christian the discretion to withhold overnight visitation with Mindi if she

cohabits with someone of the opposite sex, and vice versa, is an unlawful delegation of the trial court's duty.

[12] It is the responsibility of the trial court to determine questions of custody and visitation of minor children according to their best interests. This is an independent responsibility and cannot be controlled by the agreement or stipulation of the parties themselves or by third parties. *Deacon v. Deacon*, 207 Neb. 193, 297 N.W.2d 757 (1980), *disapproved on other grounds*, *Gibilisco v. Gibilisco*, 263 Neb. 27, 637 N.W.2d 898 (2002). In *Deacon*, the Supreme Court reversed an order which granted a psychologist the authority to effectively determine visitation and to control the extent and time of such visitation, concluding that such an order was an unlawful delegation of the trial court's duty that could result in the denial of proper visitation rights of the noncustodial parent. As authority for its conclusion, the *Deacon* court cited *Lautenschlager v. Lautenschlager*, 201 Neb. 741, 272 N.W.2d 40 (1978). In *Lautenschlager*, the court observed:

> The rule that custody and visitation of minor children shall be determined on the basis of their best interests, long established in case law and now specified by statute, clearly envisions an independent inquiry by the court. The duty to exercise this responsibility cannot be superseded or forestalled by any agreements or stipulations by the parties.

201 Neb. at 743-44, 272 N.W.2d at 42. The Supreme Court in *Deacon* specifically took note that the reasoning of *Lautenschlager* was being extended to third parties. The reasoning of *Deacon* has also been applied in other contexts. See, *In re Interest of D.M.B.*, 240 Neb. 349, 481 N.W.2d 905 (1992) (finding plain error in juvenile court's requirement that parent participate in support group and follow all directions of counselor); *Ensrud v. Ensrud*, 230 Neb. 720, 433 N.W.2d 192 (1988) (disapproving of district court order authorizing child custody officer to control custody and visitation rights of minor child); *In re Interest of Teela H.*, 3 Neb. App. 604, 529 N.W.2d 134 (1995) (holding that juvenile court order granting psychologist authority to determine time, manner, and

extent of parental visitation was improper delegation of judicial authority).

In the present case, the delegation is not to a third party; rather, it is to the custodial parent. But, the rationale of the aforementioned cases applies with equal force when it is the custodial parent who is granted the authority to determine the visitation privileges of the noncustodial parent, because setting the time, manner, and extent of visitation is solely the duty of the court. Indeed, in *Deacon*, the Supreme Court said, "[The custodial parent's] position that visitation rights should be at his discretion, as in his judgment shall be reasonable and proper for the best interests of the children, is erroneous and cannot be sustained." 207 Neb. at 200, 297 N.W.2d at 761-62. We therefore find that the district court abused its discretion in allowing Christian to determine whether Mindi is entitled to overnight visits, and we modify the parenting plan to remove that provision.

*Expert Witness Fee.*

Mindi contends that the district court erred in ordering her to pay a portion of Dr. Schroeder's expert witness fee. She argues that Dr. Schroeder's opinion was not helpful to the court in determining what was in Graham's best interests and that she was earning less money than Christian at the time of trial.

[13,14] Neb. Rev. Stat. § 42-367 (Reissue 2008) permits a court to direct costs against either party in an action for dissolution of marriage. In *Lockwood v. Lockwood*, 205 Neb. 818, 290 N.W.2d 636 (1980), the Nebraska Supreme Court upheld the taxing of expert witness fees as costs under § 42-367 where there was evidence of a contract that the witness had been employed by the wife, the witness testified to the value of his services, and the documents and the testimony were accepted into evidence at trial. In a dissolution action, an appellate court reviews an award of expert witness fees de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Drew on behalf of Reed v. Reed*, 16 Neb. App. 905, 755 N.W.2d 420 (2008).

In this case, the evidence establishes that Christian requested Dr. Schroeder's services and her testimony at trial. She testified that she was charging $600 for her services. Although Dr. Schroeder could not opine as to which parent was a better fit for Graham, the district court cited her opinion of Christian in its analysis of Christian as a parent and ultimately awarded custody to Christian. Given this and the relative similarity in the parties' incomes as determined by the trial court, we find no abuse of discretion in ordering the parties to equally divide the costs of the action, including Dr. Schroeder's fee.

*Child Support.*

[15] On cross-appeal, Christian claims the district court erred in deviating from the child support guidelines without good cause. In dissolution of marriage actions, the trial court's determination of child support is reviewed for an abuse of discretion. See *Bussell v. Bussell*, 21 Neb. App. 280, 837 N.W.2d 840 (2013).

[16,17] The child support guidelines are to be applied as a rebuttable presumption to both temporary and permanent support, and any deviation from the guidelines must take into consideration the best interests of the children. *Wilkins v. Wilkins*, 269 Neb. 937, 697 N.W.2d 280 (2005). A court may deviate from the guidelines when one or both of the parties have provided sufficient evidence to rebut the presumption. *Id.*

[18,19] The guidelines provide that a deviation is permissible whenever the application of the guidelines in an individual case would be unjust or inappropriate. Neb. Ct. R. § 4-203(E) (rev. 2011). The guidelines also allow for a deduction in determining monthly net income for biological or adopted children for whom the obligor provides regular support. Neb. Ct. R. § 4-205(E).

As the custodial parent of Berkley, Mindi clearly provides regular support for her; however, Mindi did not provide any evidence of the amount of such support or request a deviation from the guidelines on that basis. In fact, Mindi did not request a deviation from the guidelines at all. Further, the district court did not conclude that a deviation was in the best interests of

Graham. Consequently, we conclude that there was insufficient evidence to rebut the presumption that the guidelines should be applied. Therefore, the district court abused its discretion when it entered a child support order that deviated from the child support guidelines without good cause.

Based on the child support worksheet completed by the district court, Mindi should have been required to pay $626 per month. We therefore modify the decree to award Christian $626 per month in child support. The trial court entered its decree on July 19, 2013. If the trial court had ordered child support to be paid as required by the guidelines, the first installment would have been due on August 1. The decree as modified by this opinion shall operate accordingly. See *Pursley v. Pursley*, 261 Neb. 478, 623 N.W.2d 651 (2001).

## CONCLUSION

We find that the district court did not abuse its discretion in allowing the Lincoln County action to proceed, awarding custody of Graham to Christian, or dividing the costs of the action equally between the parties. However, the cohabitation restriction is impermissible, and we therefore remove it from the parenting plan. Likewise, it was an abuse of discretion for the district court to deviate from the child support guidelines without good cause. Accordingly, we modify the decree to order Mindi to pay $626 per month in child support in accordance with the child support guidelines.

Affirmed as modified.